UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 8 2014
```

-------------------------------------------------------------------X

STEVEN WALLACE,                                :

                Plaintiff,            :

      -v-                               :

                                 :

NATIONAL RAILROAD PASSENGER CORP. d/b/a     :
AMTRAK,                                       :      11 Civ. 5419 (AJN)
                                              :
                Defendant and Third Party     :      MEMORANDUM &
                Plaintiff,                    :      ORDER
      -v-                               :

WEEKS MARINE, INC.,                           :
                                              :
                Third Party Defendant and Fourth :
                Party Plaintiff,             :
      -v-                               :

LIBERTY SURPLUS INSURANCE CORP.,             :
                                              :
                Fourth Party Defendant.       :

-------------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

      Plaintiff Steven Wallace was injured when he fell from a floating platform that he was

working on while repairing a bridge owned by Defendant National Railroad Passenger Corp.

d/b/a Amtrak ("Amtrak"). In this diversity action, Wallace brought several state law causes of

action against Amtrak, seeking to recover for his injuries. Amtrak, in turn, filed a third-party

complaint against Wallace's employer, Weeks Marine, Inc. ("Weeks"), alleging that Weeks had

indemnified it against Wallace's claims. Weeks then brought a fourth-party complaint against

Liberty Surplus Insurance Corp. ("Liberty"), Amtrak's insurer, claiming that Liberty, not Weeks, should pay for Wallace's injuries.

Following discovery, the parties filed motions for summary judgment, which are now before the Court.  Wallace moves for summary judgment as to liability on his claims under New York Labor Law Sections 240(1) and 240(6), Dkt. No. 58; Amtrak and Weeks move for summary judgment on all of Wallace's claims against Amtrak, Dkt. Nos. 46, 51; Amtrak and Weeks cross-move for summary judgment on Amtrak's claims against Weeks, Dkt. Nos. 89, 95; and Liberty and Weeks cross-move for summary judgment on Weeks's claims against Liberty, Dkt. Nos. 95, 102.  For the following reasons, Wallace's motion is granted in part and denied in part, Amtrak's and Weeks's motions against Wallace are granted in part and denied in part, Amtrak's motion against Weeks is granted in part and denied in part, Weeks's motion against Amtrak is granted in part and denied in part, Weeks's motion against Liberty is denied, and Liberty's motion against Weeks is granted in part and denied in part.  In light of this disposition, Weeks's cross-motion to strike portions of Wallace's affidavit, Dkt. No. 63, is denied as moot.

## I.    BACKGROUND

Unless otherwise noted, the following facts are undisputed and are based on the Court's review of the record, undertaken with particular attention to the evidence cited in the parties' Local Rule 56.1 statements.  *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000); *Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 551 (S.D.N.Y.), *superseded on other grounds on reconsideration*, 934 F. Supp. 2d 584 (S.D.N.Y. 2013).

2

## A. The Construction Project

The Pelham Bay Bridge is a railroad bridge that crosses the Hutchinson River. Amtrak 3/1 56.1 ¶¶ 5–6.[1] Amtrak, which owns the bridge, engaged Weeks in September 2009 to be the general contractor for a construction project involving the rehabilitation of the bridge. *Id.*; Joseph 3/1 Decl. Ex. A. Specifically, Weeks's task was to strengthen the structural piles (or columns) supporting the bridge. Amtrak 3/1 56.1 ¶ 6. This task involved encasing the piles with steel reinforcement bars, or "rebar," which would support fiberglass and cement casing where the piles were damaged or deteriorated. *Id.*; Weeks 3/1 56.1 ¶ 5.

Amtrak stationed safety officers at the bridge to help prevent Weeks's employees from being hit by trains. Amtrak 3/1 56.1 ¶ 24. Additionally, John Ramo, Amtrak's project manager for the Pelham Bay Bridge project, attended about 50 meetings there to oversee the project and attend progress meetings. Ramo Dep., Hansen Aff. Ex. 4, at 14. He testified that he was at the bridge about once a week, and that Amtrak had several employees stationed there daily, including an inspector to ensure that "the contractors' operations [would not] impact the safe passage of trains" and that the project was proceeding on schedule. *Id.* at 17–20.

## B. Wallace's Accident

Wallace, a Weeks employee, worked as a dock builder on the bridge project for several weeks during the spring of 2010. Amtrak 3/1 56.1 ¶ 5; Weeks 3/1 56.1 ¶ 4; Wallace Dep., Joseph 3/1 Decl. Ex. B, at 11. One of his tasks was installing rebar cages around the bridge pilings. Weeks 3/1 56.1 ¶¶ 5, 9. To allow its workers to access the pilings, Weeks used a series

---

[1] Because Amtrak and Weeks are involved in multiple sets of cross-motions, the Court will distinguish between their evidentiary materials by specifying the date on which the cited document was filed and between their briefs by indicating the party against which the brief is directed. For example, "Joseph 3/1 Decl." refers to the Declaration of Ronald E. Joseph filed on March 1, 2013, Dkt. No. 52, and "Amtrak (Wallace) Br." refers to Amtrak's opening brief in support of its motion for summary judgment against Wallace, Dkt. No. 53.

of wooden "float stages" that were set in the water. The float stages were composed of 12" by 12" or 16" by 16" wooden planks, approximately 20 feet long, which were pinned together side by side, for a total width of five to six feet. Amtrak 3/1 56.1 ¶¶ 9–11; Weeks 3/1 56.1 ¶¶ 6–7; Wallace 56.1 ¶ 8. These float stages acted as "sidewalks" along which Weeks workers could walk in order to access the piles. Amtrak 3/1 56.1 ¶ 10. The tops of the float stages were about three to four inches above the surface of the water, but could be lower depending on how much weight they were bearing at any given time. *Id.* ¶ 12. Weeks owned and maintained these float stages. *Id.* ¶ 13.

Wallace testified at his deposition that the float stages were in bad condition, in that they had pieces of wood missing and "were literally falling apart under your feet, a lot of them." Wallace Dep., Joseph 3/1 Decl. Ex. B, at 60. Jason Monach, Wallace's co-worker, also testified that Weeks employees often had to repair parts of the float stages "where the wood was not quite flush and it was awkward to walk on." Monach Dep., Hansen Aff. Ex. 8, at 43. Additionally, Mark McMahon, a Weeks foreman, stated in his deposition that "moss" on the surface of the float stages was an "ongoing problem," and that workers had complained to him that the stages were too slippery as a result. McMahon Dep., Hansen Aff. Ex. 7, at 42–43. However, Ramo, Amtrak's project manager, testified that he never knew of any concerns regarding the safety of the float stages. Ramo Dep., Joseph 3/1 Decl. Ex. G, at 44.

On May 6, 2010, Wallace and his co-workers were in the process of installing a rebar cage. A crane initially lowered the cage from a barge onto a float stage. Weeks 3/1 56.1 ¶ 11; Wallace 3/1 56.1 ¶ 11. Then, Wallace and three others began carrying the cage along the float stages, with one worker holding each corner of the cage. Wallace Dep., Joseph 3/1 Decl. Ex. A, at 56. The workers walked on the outside of the cage, so that they were near the edge of the float

4

stages, with the cage suspended between them over the center of the stages. Wallace 3/1 56.1 ¶ 13; Wallace Dep., Joseph 3/1 Decl. Ex. A, at 56. Wallace manned the front right corner of the cage, with his right side facing the water. Wallace Dep., Joseph 3/1 Decl. Ex. A, at 56; Quesada Dep., Joseph 3/1 Decl. Ex. J, at 79. The other Weeks employees carrying the cage were Monach, Peter Fitzpatrick, and Matthew Quesada. Amtrak 3/1 56.1 ¶ 15 n.10.

The four men had walked along two float stages and had crossed to a third when Wallace fell. Weeks 3/1 56.1 ¶¶ 12–13. At his deposition, Wallace stated that his fall resulted from his stepping on the side of the float stage, where a piece of the float stage was "missing." Wallace Dep., Joseph 3/1 Decl. Ex. B, at 259, 262. After he stepped on the missing piece of the float stage, Wallace testified, his "leg rolled under where the piece was missing and then [he] went down to the float stage and into the water." *Id.* at 259; Weeks 3/1 56.1 ¶ 13. Monach, Wallace's co-worker, recalls Wallace stating at the time of the accident that he "he slipped on the float stage." Monach Dep., Hansen Aff. Ex. 8, at 67; *see also id.* at 78–79 ("I do believe [Wallace] mentioned that he slipped."). According to Monach, who examined the area where Wallace fell after the accident occurred, the float stage had "a small rounded edge to the side [Wallace] was walking on," which "had a little bit of algae on the side and underneath part." *Id.* at 67.

After falling from the float stage, Wallace ended up in the water, although it is unclear whether he was ever fully submerged. *Compare* Wallace Dep., Betancourt 3/1 Decl. Ex. A, at 249 (fully submerged), *with* Monach Dep., Betancourt 3/1 Decl. Ex. E, at 76 (about two-thirds submerged). In any event, he bobbed to the surface because he was wearing a life vest, and his co-workers pulled him out. Wallace Dep., Betancourt 3/1 Decl. Ex. A, at 249. In all, Wallace was in the water for less than a minute. Amtrak 3/1 56.1 ¶ 19. He testified at his deposition that he did not know how deep he fell or whether he impacted the bottom of the river. Wallace Dep.,

Joseph 3/1 Decl. Ex. B, at 69–71, 250. The parties dispute how deep the water in the river was at the time Wallace fell: Amtrak and Weeks claim that, based on the tides, the water was no more than four and a half feet deep. Amtrak 3/1 56.1 ¶ 20; Weeks 3/1 56.1 ¶ 17. However, Quesada stated at his deposition that he thought the water was about twelve feet deep. Wallace 56.2 3/1 ¶ 21. Wallace's affidavit, submitted in connection with his motion for summary judgment, states that the water was approximately six to ten feet deep. Wallace Aff. ¶ 8.

After Wallace was removed from the water, his leg was bleeding and he was in pain, but he was not sure whether he was badly injured. Wallace Dep., Joseph 3/1 Decl. Ex. B, at 74, 77–78. He changed his clothes and continued working. *Id.* at 81. He reported his fall to McMahon, Weeks's foreman, later that day. Amtrak 3/1 56.1 ¶ 2. He also filled out an accident report, which is dated May 13, 2011, although Wallace may have filled out the report as early as May 6. Wallace Dep., Hansen Aff. Ex. A, at 91–93. Wallace also sought medical care subsequent to the accident, possibly as late as May 14, 2011. Wallace Dep., Betancourt 3/1 Decl. Ex. A, at 101. He later underwent neck surgery. *Id.* at 145.

Following Wallace's fall, his co-worker Fitzpatrick examined the float stage and saw that it was damaged where Wallace fell. Wallace 56.1 ¶ 24; Fitzpatrick Dep., Hansen Aff. Ex. 6, at 46–49. Additionally, a post-accident report prepared by Travis Iapicco, Weeks's field engineer, stated that the cause of Wallace's accident was a "small area of float stage missing on [the] outermost edge." Iapicco Dep., Hansen Aff. Ex. 3, at 50. However, Iapicco also testified that the missing piece on the edge of the float stage was "nothing abnormal" and part of general wear and tear. Iapicco Dep., Joseph 3/22 Opp. Decl. Ex. C, at 32. Moreover, Iapicco was pointed to the relevant area of float stage by McMahon, and there is no evidence that either Iapicco or

McMahon actually knew which float stage Wallace fell from, since the stages were frequently rearranged and had no identifying characteristics.  Amtrak 3/22 56.1 Resp. ¶ 10.

### C.  The Parties' Contracts

On or about September 17, 2009, Amtrak and Weeks entered into a contract (the "Construction Contract"), under which Weeks would be the general contractor for the bridge project.  Weeks 8/14 56.1 Resp. (Amtrak) ¶¶ 6–8; Joseph 7/25 Decl. Ex. A.  The contract provides that it is to be "governed by and construed in accordance with the laws of the District of Columbia without regard to choice of law consideration."  Joseph 7/25 Decl. Ex. A § 81.1.[2]

The Construction Contract also contains a section titled "Indemnification."  That section provides:

> 68.1.  Contractor [Weeks] agrees to defend, indemnify and hold harmless Amtrak, its officers, directors, employees, agents, servants, successors, assigns and subsidiaries (collectively "Indemnified Parties") from and against any claims, losses, liabilities (including without limitation environmental liabilities), penalties, fines, causes of action, suits, costs, and expenses incidental thereto (including costs of defense and attorneys' fees) (collectively "Claims") which any of the Indemnified Parties may hereafter incur, be responsible for or pay as a result of breach of warranty, injury or death of any person, or damage to or loss (including loss of use) any property, including property of the parties hereto, arising out of or in any degree directly or indirectly caused by or resulting from materials or deliverables supplied by, or from activities of, or Work performed by Contractor, Contractor's officers, employees, agents, subcontractors, or any other person acting for or with the permission of Contractor under the Contract, or as a result of Contractor's failure to perform its obligations in compliance with the Contract Documents.
>
> 68.2.  In addition to the foregoing, Contractor agrees to defend, indemnify and hold harmless the Indemnified Parties, irrespective of any negligence or fault on the part of the Indemnified Parties, from and against any Claims which any of the Indemnified Parties

---

[2] The Construction Contract comprises several parts, including an initial nine-page section describing the Pelham Bay Bridge project and the work Weeks would perform, and a longer form contract titled "General Provisions." Citations to Exhibit A of the July 25, 2013 Joseph Declaration refer to the corresponding sections of the General Provisions.

may hereafter incur, be responsible for or pay as a result of injuries (including death) to any of Contractor's employees, agents or subcontractors.

68.3.  The indemnification obligation under this Section shall not be limited by the existence of any insurance policy procured or maintained by Contractor or by any limitation on the amount or type of damages, compensation or benefits payable by or for Contractor or any subcontractor and shall survive the termination of the Contract.

Joseph 7/25 Decl. Ex. A § 68.

The Construction Contract also contains a section titled "Insurance," which requires

Weeks to "procure and maintain, at all times during the term of this Contract, at its own cost and

expense, the types of insurance specified herein." Joseph 7/25 Decl. Ex. A § 69.1. Two of those

types were commercial general liability insurance and railroad protective liability insurance. The

contract described those types of insurance, respectively, as follows:

(b)  Commercial General Liability Insurance.  A policy issued to and covering liability imposed upon Contractor arising out of the Work to be performed and all obligations assumed by Contractor under the terms of this Contract. . . .

(e)  Railroad Protective Liability Insurance. . . . A policy . . . in the name of [Amtrak] (and any other railroad operating over the tracks).  The policy shall have a combined single limit of liability of not less than two million dollars ($2,000,000) per occurrence for Coverages A and B with a six million dollar ($6,000,000) annual aggregate. . . . The original policy shall be submitted to Amtrak prior to commencement of Work.

Id. § 69.2(b), (e).  Pursuant to these requirements, Weeks purchased a railroad protective liability

policy (the "RPL Policy") and a commercial general liability policy (the "CGL Policy").

The RPL Policy was issued by Liberty. Weeks 8/14 56.1 Resp. (Amtrak) ¶ 13.  The

premium for the RPL Policy was $47,021. Joseph 7/25 Decl. Ex. H Item 9.  In the RPL Policy,

Amtrak is listed as the "Named Insured," and Weeks, which procured the policy, is listed as the

"Designated Contractor."  Id. Items 1, 3.  The policy defines the term "insured" as the Named

Insured (that is, Amtrak), its executive officers and directors, its stockholders, and railroads

8

operating over its tracks. *Id.* § II.1–4. It provides that Liberty will cover "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damages' to which this insurance applies," but that such coverage applies only to injuries and damages that "arise[] out of acts or omissions at the 'job location' which are related to or are in connection with the 'work' described in the Declarations" (in addition to several other exclusions not relevant here). *Id.* § I.A.1.a, b. (The declarations section makes clear that the "job location" is Pelham Bay Bridge, and the "work" is the rehabilitation project that Amtrak contracted with Weeks to perform. *Id.* Items 5, 8.)

In addition, the RPL Policy contains a section titled "Other Insurance." That section provides in relevant part that "[t]he insurance afforded by this policy is . . . [p]rimary insurance and we will not seek contribution from any other insurance available to you except if the other insurance is provided by a contractor other than the designated contract for the same operation and 'job location.'" Joseph 7/25 Decl. Ex. E § IV.A.6. The RPL Policy also contains a transfer of rights provision, which states, "[i]f the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us." *Id.* § IV.A.8.

The CGL Policy that Weeks purchased was issued by the Indemnity Insurance Company of North America ("ACE"). Betancourt 8/14 Opp. Decl. (Amtrak) Ex. A. The premium for the CGL Policy was $675,000. *Id.* at 1. Under that policy, Weeks is the "Named Assured." *Id.* at 5. The policy provides that it will pay on Weeks's behalf for bodily injury and property damage claims, subject to the policy's terms. *Id.* at 14. Like the RPL Policy, the CGL Policy contains a provision titled "Other Insurance," which states:

> If other valid and collectible insurance with any other Insurer is available to the Assured covering a loss also covered by this policy, other than Insurance, that is excess of the Insurance afforded by this Policy, the Insurance afforded by this Policy shall be in excess

9

of and shall not contribute with such other Insurance, either as double insurance or otherwise. Nothing herein shall be construed to make this Policy subject to the terms and conditions and limitations of other insurance.

*Id.* § 14, at 9.

### D. Amtrak's Communications with Weeks and Liberty

On September 13, 2011, Amtrak's Director of Claims/Litigation, Paul Michalski, sent a letter to Weeks, notifying it of Wallace's claims and demanding that Weeks "protect, defend, indemnify and save Amtrak harmless in this litigation." Joseph 7/25 Decl. Ex. B. Weeks did not respond to that letter. On September 14, Ronald Betancourt of the law firm Betancourt, Van Hemmen, Greco & Kenyon LLC ("BVGK") wrote to Michalski, stating that BVGK had been engaged by Weeks to defend Amtrak against Wallace's claims. However, Betancourt's letter did not mention Weeks's indemnification obligation. Joseph 7/25 Decl. Ex. C. In light of that silence, Michalski emailed Teresa Olivo, Weeks's personal injury claims manager, on September 15, 2011, expressing confusion about BVGK's letter insofar as it was silent regarding indemnification. Michalksi expressed his "understanding that Weeks Marine WILL indemnify Amtrak," and asked Weeks to confirm that understanding. Joseph 7/25 Decl. Ex. D. Weeks's corporate risk manager, Tom Langan, replied to Michalski, copying Olivo. Langan wrote, "I'm not sure what you find confusing" about BVGK's letter, stated his view that BVGK's letter indicated that it was litigation counsel, not coverage counsel, and did not mention Weeks's indemnification obligation. Joseph 7/25 Decl. Ex. E.

At the same time, Amtrak was also communicating with Liberty regarding Wallace's claims. After being informed of the lawsuit, Liberty engaged Railway Claims Services, Inc. ("RCS") to act as its third-party claims administrator. Liberty 56.1 Resp. ¶¶ 18, 19. On September 22, 2011, Randal Little, RCS's director of operations, emailed Amtrak's Michalski on

Liberty's behalf. The email stated that "Liberty's Policy is a Railroad Protective Policy that provides coverage for and on behalf of Amtrak, and is not intended to serve as primary insurance for this loss." It indicated that the Construction Contract between Amtrak and Weeks "clearly requires Weeks Marine to indemnify Amtrak for any injuries to Weeks Marine Employees." As a result, Little wrote, "Liberty does not wish to participate in the direction and defense of this loss by Weeks and the attorney Weeks has elected to retain." Little's email also stated that Liberty would fulfill its obligations to Amtrak under the RPL policy. Betancourt 8/14 Opp. Decl. (Liberty) Ex. E. Attached to the email was a letter from RCS stating that a review was necessary to determine Liberty's obligations, and reminding Amtrak of its own obligations under the RPL policy. Betancourt 8/14 Opp. Decl. (Liberty) Ex. F.

According to Michalski's deposition testimony, Amtrak's typical practice when faced with personal injury claims was to tender its defense to the contractor and await a reply. If the contractor agreed to defend and indemnify Amtrak, then the contractor would assume Amtrak's defense and appoint counsel of its choosing to represent Amtrak. However, if the contractor "did not respond in a favorable manner as to their requirements pursuant to the indemnity," Amtrak would seek to protect its own interests. Michalski Dep., Muilenberg Opp. Decl. Ex. B, at 45.

Accordingly, following Amtrak's initial communications with Weeks and Liberty, and in light of Weeks's continued silence regarding its indemnification obligations, Liberty, Amtrak, and RCS agreed that Landman Corsi Ballaine & Ford P.C. ("LCBF") should represent Amtrak, rather than BVGK, which had been chosen by Weeks. Little Dep., Joseph 8/14 Opp. Decl. Ex. I, at 22, 52–53; Little Dep., Muilenberg Decl. Ex. K, at 43. On September 28, 2011, LCBF called BVGK's Betancourt, stating that Liberty had instructed LCBF to take over Amtrak's defense.

11

Liberty 56.1 Resp. ¶¶ 22, 23. On October 6, 2011, Amtrak filed a notice of substitution of counsel, endorsed by Amtrak, in which LCBF was formally substituted for BVGK. Dkt. No. 5.

On October 7, 2011, after LCBF had taken over Amtrak's defense, LCBF's Ronald Joseph sent a letter to Weeks's Langan. In the letter, Joseph summarized the earlier communications between Michalski and Weeks, and pointed to Weeks's silence regarding its indemnification obligation. Joseph then quoted at length from the Construction Contract, and indicated that under the contract, Weeks was required to indemnify Amtrak against Wallace's claims. Joseph asked Langan to sign a statement that "Weeks Marine will defend, indemnify and hold harmless" Amtrak in Wallace's lawsuit. Joseph 7/25 Decl. Ex. F. The next day, Langan responded to Joseph by email. He wrote,

> I have no intention of signing the statement at the bottom of your letter. The indemnification section of the contract speaks for itself. . . . I reserve the right to see if Wallace can prove that his alleged injuries were the result of the sole negligence or gross misconduct of Amtrak (which I recognize is highly unlikely). Nevertheless, if Wallace can make such a showing, I believe Amtrak's indemnification clause can be challenged on public policy grounds as this was a construction contract.

Joseph 7/25 Decl. Ex. G.

### E. Procedural History

Wallace filed a complaint against Amtrak on August 4, 2011, and the case was initially assigned to Judge Koeltl. Dkt. No. 1. Amtrak answered on October 7, and filed a third-party complaint against Weeks on October 20, which Weeks answered. Dkt. Nos. 8, 12. On February 14, 2012, the case was reassigned to the undersigned. On March 1, 2013, the parties filed their motions for summary judgment on Wallace's claims, which were fully submitted as of March 29. On April 11, Weeks amended its answer to Amtrak's third-party complaint in order to assert a fourth-party complaint bringing Liberty into the case. Dkt. Nos. 77, 83. Amtrak, Weeks, and

Liberty filed their cross-motions for summary judgment with respect to their claims against each other on July 25. The motions are fully submitted.

## II.    LEGAL STANDARD

Summary judgment is appropriate when, after reviewing the evidence in the light most favorable to the non-moving party, *Nabisco v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000), "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nabisco*, 220 F.3d at 45 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Although Rule 56 places the burden on the moving party to demonstrate that no genuine issue of material fact exists, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Specific evidence means more than "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

Finally, much of this case centers on the interpretation of contractual provisions. "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). However, "the court may

13

resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary." *Id.* at 158 (alteration in original) (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999)) (internal quotation marks omitted).

## III.   DISCUSSION

The Court first addresses Wallace's claims against Amtrak, then Amtrak's claims against Weeks, and finally Weeks's claims against Liberty.

### A.  Wallace's Claims Against Amtrak

Wallace asserts claims under New York law for common law negligence and violations of New York Labor Law Sections 200, 240(1), and 241(6).  Compl. ¶¶ 19, 27; Wallace Opp. at 1. Weeks and Amtrak both move for summary judgment in Amtrak's favor on all of these claims, and Wallace moves for summary judgment on his claims under Labor Law Sections 240(1) and 241(6).  Dkt. Nos. 46, 51, 58.  Wallace has briefed only his Section 240(1) claims separately, leaving his Section 241(6) arguments for his opposition brief.  But this irregularity is of no moment, since in any event "a court may grant summary judgment to a non-moving party, provided that party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir. 1999).

#### 1.   Local Rule 56.1

Before turning to the merits of Wallace's claims, the Court addresses Amtrak's contention that because Wallace failed to file a response to its Local Rule 56.1 statement of undisputed facts, the allegations in its statement should be deemed true for purposes of this motion. *See, e.g., Galasso v. Eisman, Zucker, Klein & Ruttenberg*, 310 F. Supp. 2d 569, 572

(S.D.N.Y. 2004) (McMahon, J.).  A district court has discretion whether to conduct its own

review of the record, and if "the record does not support the assertions in a Local Rule 56.1

statement, those assertions should be disregarded and the record reviewed independently." *Holtz*

*v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated on other grounds by Gross v.*

*FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–77 (2009).  The Court has taken that approach here and

examined whether the record supports Amtrak's factual assertions.  Moreover, it would be

particularly formalistic to deem all of Amtrak's claims admitted given that Wallace filed a Rule

56.1 statement along with his own motion, thereby allowing the Court to focus on the pertinent

factual issues.  *See id.* ("The purpose of Local Rule 56.1 is to streamline the consideration of

summary judgment motions by freeing district courts from the need to hunt through voluminous

records without guidance from the parties.").

2.   Common Law Negligence and Labor Law Section 200

Labor Law Section 200 is "a codification of the common-law duty imposed upon an

owner or general contractor to maintain a safe construction site," *Rizzuto v. Wenger Contracting*

*Co.*, 91 N.Y.2d 343, 352 (1998); *Cun-En Lin v. Holy Family Monuments*, 796 N.Y.S.2d 684, 686

(2d Dep't 2005), and New York courts analyze common law claims alleging an unsafe

workplace under the same framework as Section 200 claims, *see, e.g.*, *Comes v. N.Y. State Elec.*

*& Gas. Corp.*, 592 N.Y.S.2d 478, 479 (3d Dep't 2005).  The Court will do the same here, since

the negligence allegations in Wallace's complaint center on Amtrak's alleged failure to "provide

plaintiff with an adequately safe place to work" and the like.  Compl. ¶ 20; *cf. Palen v. ITW*

*Mortg. Invs. III, Inc.*, No. 99 Civ. 3850 (GBD), 2003 WL 1907980, at *5 (S.D.N.Y. Apr. 17,

2003) (analyzing common law and Section 200 claims together given similarity between "the

facts and theories of liability alleged in support of plaintiff's claims").

15

Ordinarily, "there is no liability under the common-law or Labor Law § 200 unless the owner or general contractor exercised supervision or control over the work performed." *Cun-En Lin*, 796 N.Y.S.2d at 686. However, as Wallace points out, New York courts have recognized an exception to this principle: where a plaintiff's claims are "based not on the injured plaintiff's employer's methods or materials but on a dangerous condition on the [work] site," the question is not whether the defendant "exercised supervisory control over the manner of performance of the injury-producing work," but rather whether it "had notice of the condition." *Minorczyk v. Dormitory Auth. of New York*, 74 A.D.3d 675, 675 (1st Dep't 2010); *see also Seda v. Epstein*, 72 A.D.3d 455, 455 (1st Dep't 2010) (where plaintiff's claim involves "defective condition of the premises, . . . [t]he issue is whether defendants either created or had notice of" the condition). Thus, courts have drawn a distinction between "manner" cases, in which supervisory control is required for liability, and "premises" cases, in which notice of a dangerous condition is sufficient. *Zapata v. Riverside Study Ctr., Inc.*, No. 10 Civ. 6283 (CM), 2012 WL 1744792, at *10 (S.D.N.Y. May 16, 2012); *Ortega v. Puccia*, 866 N.Y.S.2d 323, 329 (2d Dep't 2008).

Although Wallace argues that this is a premises case, Weeks—and not Amtrak—owned and provided the float stages at Wallace's work site. Amtrak (Wallace) Reply at 3; Amtrak 3/1 56.1 ¶ 13. Therefore, because a float stage is analogous to a ladder or scaffold, *see Dooley v. Peerless Imps., Inc.*, 837 N.Y.S.2d 720, 724 (2d Dep't 2007), this may be better characterized as a manner case; the New York Court of Appeals has held that "if the contractor furnishes such appliances, the [property owner] does not thereby become responsible for their sufficiency," *Persichilli v. Triborough Bridge & Tunnel Auth.*, 16 N.Y.2d 136, 146 (1965) (quoting *Hess v. Bernheimer & Swartz, Pilsener Brewing Co.*, 219 N.Y. 415, 419 (1916)); *see Ortega*, 866 N.Y.S.2d at 330 (claims of a defective scaffold "involved the manner in which the plaintiff

16

performed his work"). The Court need not decide this question, however, because Wallace's claims fail under either rubric.

There is no evidence from which a jury could conclude that Amtrak supervised or controlled the manner of Wallace's work. "[M]ere general supervisory authority at a worksite for the purpose of overseeing the progress of the work and inspecting the work product is insufficient" for liability; the defendant must "bear[] the responsibility for the manner in which the work is performed." *Ortega*, 866 N.Y.S.2d at 330. The record indicates that Weeks, as contractor, was responsible for the manner in which Wallace's work was performed. Amtrak 3/1 56.1 ¶¶ 6–13, 19, 22; Wallace Dep., Joseph 3/1 Decl. Ex. B, at 264 ("Q: Nobody from Amtrak told you how to do your job, did they?  A: No."). Amtrak's day-to-day involvement consisted of ensuring that the project was proceeding according to schedule and that Weeks's workers would not be hit by trains. Amtrak 3/1 56.1 ¶¶ 24–25; Ramo Dep., Hansen Aff. Ex. 4, at 17–20. That is insufficient.

Wallace appears to concede as much, as his chief argument against summary judgment is that Amtrak and Weeks have not pointed to any evidence that Amtrak knew of a defective condition on the premises. Wallace Opp. at 2–5. But even if this is a premises case, Wallace misunderstands the parties' burdens under Rule 56. Whether Amtrak had notice of a defective condition is an element of Wallace's case that he would be required to prove at trial. *See, e.g.,* *Custer v. Cortland Housing Auth.*, 697 N.Y.S.2d 739, 740 (3d Dep't 1999). On summary judgment, it is "sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano*, 575 F.3d at 204; *see Celotex Corp.*, 477 U.S. at 322–23 (summary judgment is proper where there is a "complete failure of proof concerning an essential element of the nonmoving party's case"). Wallace cites only New York

17

cases, which require the movant to make a prima facie factual showing concerning the elements

of the non-movant's claims. *E.g.*, *Spector v. Cushman & Wakefield, Inc.*, 928 N.Y.S.2d 9, 10

(1st Dep't 2011); *see Smalls v. AJI Indus., Inc.*, 10 N.Y.3d 733, 734 (2008) ("[T]he proponent of

a summary judgment motion must . . . tender[] sufficient evidence to demonstrate the absence of

any material issues of fact.  Failure to make such prima facie showing requires a denial of the

motion, regardless of the sufficiency of the opposing papers." (emphasis omitted) (quoting

*Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324 (1986))).  That principle has no application in

federal court. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal

courts sitting in diversity apply state substantive law and federal procedural law.").

There is no evidence that Amtrak had notice of any defects that may have afflicted the

float stage where Wallace's accident occurred.  Wallace denies that he ever told Amtrak about

such conditions.  Wallace Dep., Joseph 3/1 Decl. Ex. B, at 264.  Under the misimpression that

this lack of proof works to his benefit in this procedural posture, Wallace has not "come forward

with admissible evidence sufficient to raise a genuine issue of fact for trial." *Cordiano*, 575 F.3d

at 204.  Indeed, what evidence there is suggests that Amtrak did not have notice of any unsafe

condition. *See* Amtrak 3/1 56.1 ¶ 26; Ramo Dep., Joseph 3/1 Decl. Ex. G, at 44 (testimony of

Amtrak project manager who occasionally inspected the work site that he was not aware of or

told about any issues concerning the condition of the float stages).  Accordingly, the Court grants

summary judgment to Amtrak on Wallace's common law negligence and Labor Law Section 200

claims.

### 3.   Labor Law Section 241(6)

Labor Law Section 241(6) requires owners and contractors to comply with regulations

promulgated by New York's Commissioner of the Department of Labor. *See Ross v. Curtis-*

*Palmer Hydro-Electric Co.*, 81 N.Y.2d 494, 501–02 (1993).  A private party may bring suit

under Section 241(6) if she alleges that "a specific and concrete provision of the Industrial Code

was violated and that the violation proximately caused . . . her injuries." *Rosado v. Briarwoods*

*Farm, Inc.*, 19 A.D.3d 396, 399 (2d Dep't 2005) (citations omitted).  In his opposition brief,

Wallace clarifies that he is alleging violations of two such provisions: subsections (d) and (e)(2)

of Industrial Code Section 23-1.7.  Wallace Opp. at 5–6.  Subsection (d) provides:

> Slipping hazards.  Employers shall not suffer or permit any employee to use a floor, passageway, walkway, scaffold, platform or other elevated working surface which is in a slippery condition.  Ice, snow, water, grease and any other foreign substance which may cause slippery footing shall be removed, sanded or covered to provide safe footing.

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.7(d).  Subsection (e)(2) provides:

> Working areas. The parts of floors, platforms and similar areas where persons work or pass shall be kept free from accumulations of dirt and debris and from scattered tools and materials and from sharp projections insofar as may be consistent with the work being performed.

*Id.* § 23-1.7(e)(2).  An owner's duties under Section 241(6) are nondelegable, so Wallace "need

not show that [Amtrak] exercised supervision or control over his worksite in order to establish

his right of recovery."  *Ross*, 81 N.Y.2d at 502.

The Court concludes that factual issues preclude Amtrak's and Weeks's motions for

summary judgment with respect to Wallace's claim under subsection (d).  Weeks initially argues

that under *O'Sullivan v. IDI Construction Co.*, 7 N.Y.3d 805 (2006), there can be no violation of

Industrial Code Section 23-1.7 if the construction equipment causing the plaintiff's fall was an

"integral part of the construction operation," and that the float stage was an integral part of

Wallace's work site.  Weeks (Wallace) Reply at 9.  However, *O'Sullivan* exclusively concerned

subsection (e), *see* 7 N.Y.3d at 806, and its holding makes sense only if confined to that context.

An integral part of a construction project neither resembles the stray objects listed in subsection

(e) nor can be easily removed to prevent a worker from tripping.  By contrast, if *O'Sullivan* applied to subsection (d), that provision would become toothless: common sense suggests that a "floor, passageway, walkway, scaffold, [or] platform" will often be an integral part of a construction operation.  The New York Court of Appeals cannot have meant to foreclose protection against slipping hazards in such a broad array of circumstances.

Weeks and Amtrak also challenge Wallace's assertion that his accident was caused by a slipping hazard.  *See* Amtrak (Wallace) Reply at 4; Weeks (Wallace) Reply at 10.  Upon reviewing the record, however, the Court concludes that there is sufficient evidence supporting Wallace's claim to create a material factual issue.

In his Rule 56.1 statement, Wallace asserts that the side of the float stage that he fell off of was slippery and covered in algae.  Wallace 56.1 ¶¶ 26–27.  The basis for this statement is the deposition testimony of Monach, who was helping Wallace carry the rebar cage along the float stage when Wallace fell.  Monach testified that when Wallace fell in the water, "he said he slipped on the float stage.  And when we looked at it, there was a small rounded edge to the side he was walking on.  It had a little bit of algae on the side and underneath part."  Monach Dep., Hansen Aff. Ex. 8, at 67; *see also id.* at 78–79 ("I do believe [Wallace] mentioned that he slipped.  And we collectively looked where he was standing and we saw a rounded part of the stage.  You could see the algae on the side.").  This testimony is corroborated, in a general way, by the deposition of Weeks foreman McMahon, who stated that "moss" on the surface of the float stages was an "ongoing problem," and that workers had complained to him that the stages were too slippery as a result.  McMahon Dep., Hansen Aff. Ex. 7, at 42–43.  Based on this evidence, a jury could conclude that the float stage on which Wallace was working was in a "slippery condition."

20

A jury could also find that this condition proximately caused Wallace's fall. *See Mack v. Altmans Stage Lighting Co.*, 98 A.D.2d 468, 470 (2d Dep't 1984) (to establish proximate cause, a plaintiff must show that the defendant's act was a "substantial factor" behind his injury). Amtrak claims that Wallace "denied that he slipped . . . at the time of the alleged incident." Amtrak (Wallace) Reply at 4 (citing Amtrak 3/1 56.1 ¶ 15). But that is not accurate. Wallace denied during his deposition that he tripped, and he did not explicitly state that he slipped, but he never *denied* that he slipped. *See* Wallace Dep., Joseph 3/1 Decl. Ex. B, at 261–63. Nor is his deposition testimony necessarily inconsistent with a finding that he slipped. *Cf. Baklous v. Amtrak*, 933 F. Supp. 2d 444, 453–54 (E.D.N.Y. 2013) (finding factual issue where plaintiff did not testify that he slipped but did not deny that he did so, and other evidence suggested that his worksite was slippery). Wallace stated that he stepped on the side of the float stage, where a piece was missing, "and my leg just folded and that was it, I was off, gone." Wallace Dep., Joseph 3/1 Decl. Ex. B, at 69. He also said that his leg "rolled under and I fell over the side." Wallace Dep., Betancourt 3/1 Decl. Ex. A, at 248. Read alongside Monach's testimony that Wallace said he slipped at the time of the accident, Wallace's descriptions are simply too vague for the Court to conclude at this stage that a slippery condition was not a substantial factor behind his fall. Summary judgment is therefore denied with respect to Wallace's claims under subsection (d).

On the other hand, viewing the evidence in the light most favorable to Amtrak and Weeks, the Court cannot conclude as a matter of law that a slippery surface *was* a substantial factor behind Wallace's fall. In particular, the fact that Wallace's own testimony fails to mention that he slipped could be a basis for questioning Monach's recollection. Therefore, Wallace's motion for summary judgment on his subsection (d) claim is also denied.

21

However, the Court grants Amtrak's and Weeks's motions for summary judgment with respect to Wallace's claim under subsection (e)(2), because that subsection is inapplicable where the "plaintiff's fall was not caused by a tripping hazard." *Farrell v. Blue Circle Cement, Inc.*, 13 A.D.3d 1178, 1179 (4th Dep't 2004); *accord Ryan v. Freidman Decorating Co.*, No. 01 Civ. 0385 (MHD), 2005 WL 1802861, at *20 (S.D.N.Y. July 28, 2005) ("the fact remains that [plaintiff] did not trip, and under those circumstances the regulation does not apply"); *Ventura v. Lancet Arch, Inc.*, 5 A.D.3d 1053, 1054 (4th Dep't 2004) ("Plaintiff testified at his deposition that he slipped on . . . wet mortar as he attempted to move the mixer, and thus he may not contend that he tripped due to a violation of subdivision (e)"); *Bale v. Pyron Corp.*, 256 A.D.2d 1128, 1128 (4th Dep't 1998) ("plaintiff slipped on ice and did not trip as the result of an obstruction such as dirt or debris within the meaning of subdivision (e)"). Although there is sufficient evidence to raise a triable issue as to whether Wallace slipped, there is no evidence in the record that he tripped. Indeed, at his deposition, he denied that he did so. Wallace Dep., Joseph 3/1 Decl. Ex. B, at 261.

### 4.   Labor Law Section 240(1)

Labor Law Section 240(1) states, in relevant part:

> All contractors and owners and their agents . . .  in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

Read literally, this statute would afford broad protection against all manner of workplace risks. However, because liability under Section 240(1) is strict—in that "contractors and owners are liable under the statute whether or not they supervise or control the work" and "the plaintiff's

22

own negligence does not furnish a defense," *Cahill v. Triborough Bridge & Tunnel Auth.*, 4

N.Y.3d 35, 39 (2004)—courts have been careful to avoid extending the statute's protections

beyond what the legislature intended, *see Heidelmark v. State*, 766 N.Y.S.2d 742, 743–44 (3d

Dep't 2003). Thus, Section 240(1) protects only against hazards "related to the effects of gravity

where protective devices are called for either because of a difference between the elevation level

of the required work and a lower level or a difference between the elevation level where the

worker is positioned and the higher level of the materials or load being hoisted or secured."

*Rocovich v. Consol. Edison Co.*, 78 N.Y.2d 509, 514 (1991). The New York Court of Appeals

has recently clarified that "the single decisive question" in determining liability "is whether

plaintiff's injuries were the direct consequence of a failure to provide adequate protection against

a risk arising from a physically significant elevation differential." *Runner v. N.Y. Stock Exch.,*

*Inc.*, 13 N.Y.3d 599, 603 (2009).

       The first question that the Court must resolve is whether, as a matter of law, Wallace

faced a risk covered by the statute. Amtrak initially argues that Section 240(1) does not apply

because the float stage where Wallace fell was not being used in the performance of his work;

instead, it was being used only as a "walkway" for Wallace and his co-workers to get from the

barge to the piles where they would install the rebar cage. Amtrak. (Wallace) Br. at 11. New

York courts have held that Section 240(1) does not apply to areas used as "passageway[s]," and

not "as a ladder, scaffold, hoist or other safety device for the benefit of the injured plaintiff in his

work." *Donohue v. CJAM Assoc., LLC*, 22 A.D.3d 710, 712 (2d Dep't 2005); *accord Creese v.*

*Long Island Light Co.*, 98 A.D.3d 708, 710 (2d Dep't 2012); *Salcedo v. Swiss Ranch Estates*, 79

A.D.3d 843, 844 (2d Dep't 2010). Amtrak's argument is unpersuasive. First, no reasonable jury

could find that Wallace was not using the float stages for his work: when he fell, he was

transporting a heavy rebar cage with the assistance of three other men. Where a passageway is used to perform work, Section 240(1) has been held to apply. *See Missico v. Tops Mkts.*, 305 A.D.2d 1052, 1052 (4th Dep't 2003) (ramp up which plaintiff pushed debris-filled wheelbarrow was a "tool used in the performance of the plaintiff's work" (quoting *Ryan v. Morse Diesel, Inc.*, 98 A.D.2d 615, 616 (1st Dep't 1983)) (internal quotation marks omitted)). Second, where a passageway provides the "sole means of access" for a plaintiff's worksite, Section 240(1) applies as well. *Arristi v. HRH Constr. LLC*, 60 A.D.3d 582, 583 (1st Dep't 2009); *Conklin v. Triborough Bridge & Tunnel Auth.*, 49 A.D.3d 320, 321 (1st Dep't 2008). Even assuming that the float stages were not used in the performance of Wallace's work, there is no evidence that Wallace had any other way to access the bridge piles, *see* Weeks 3/1 56.1 ¶ 6, so the "passageway" principle that Amtrak relies on is inapplicable as a matter of law.

*Dooley v. Peerless Importers, Inc.*, 837 N.Y.S.2d 720, a closely on-point New York case, further establishes that Wallace was protected by the statute because he faced a risk arising from physically significant elevation differential. In *Dooley*, the plaintiff was working on a floating platform while repairing the bulkhead of a dock. When the platform shifted beneath his feet, he grabbed the bulkhead and hung above the water while the platform floated away. After trying to pull himself onto the dock, the plaintiff fell in the water, hit his arm on the edge of the platform, and was injured. *Id.* at 722–23. He sued under Section 240(1), and the trial court granted summary judgment to the defendants. The Second Department reversed, holding that Dooley's case "fits comfortably within the scope of" Section 240(1). *Id.* at 724. Critically, the court analogized the floating platform to a scaffold: while the latter prevents a worker from falling through the air to the ground, the former was intended to keep the plaintiff from falling through the water to the "bottom of the creek." *Id.* As a result, a defect that "clearly" would be

24

actionable in the context of a scaffold—the lack of "a harness or a guardrail" to prevent falls—was also actionable where a floating platform was concerned. *Id.* Because the plaintiff's platform had no guardrails or tie lines to prevent his accident, the court granted summary judgment in his favor. *Id. Dooley* thus establishes as a matter of law that Section 240(1) entitles workers to adequate protection against risks arising from the elevation differential between the water's surface and its bottom. *See also Pipia v. Turner Constr. Co.*, 980 N.Y.S.2d 392, 396 (1st Dep't 2014) (relying on *Dooley* for the proposition that falling from a float stage into the water is an "elevation-related risk").[3]  That holding is squarely applicable here.

Amtrak's and Weeks's herculean efforts to distinguish *Dooley* fail. First, they argue that *Dooley*'s finding of an elevation differential turned on the fact that after the platform floated from beneath the plaintiff's feet, he hung from the bulkhead, about one to two and a half feet above the water's surface. Weeks (Wallace) Opp. at 19; Amtrak (Wallace) Opp. at 8–9. But that argument finds no support in the Second Department's opinion, which held that the relevant elevation differential lay between the floating platform, which was "at or near the surface of a creek," and "the bottom of the creek." *Dooley*, 837 N.Y.S.2d at 724. The court simply placed no emphasis on the height at which the plaintiff hung from the bulkhead. For similar reasons, the assertion that the relevant height differential is between the top of the float stage and the surface of the water is incorrect. Weeks (Wallace) Opp. at 9; Amtrak (Wallace) Opp. at 7.

---

[3] *Pipia* was decided after the parties' motions were fully briefed, and the parties have submitted letters addressing it. Amtrak claims that *Pipia* is inapposite because, unlike Wallace, the plaintiff there submitted expert testimony describing "numerous devices that could have provided additional protection against falling" from the float stage. 980 N.Y.S.2d at 396; *see* Dkt. No. 136, at 2. But as explained later in this opinion, Wallace has nonetheless introduced sufficient unrebutted evidence that there is no triable issue of fact as to causation. *See Carmody v. ADM Milling Co.*, 665 F. Supp. 147, 151 (N.D.N.Y. 1987) (awarding summary judgment to plaintiff on Section 240(1) claim and rejecting defendant's argument that expert testimony on safety devices was required).

Amtrak and Weeks also point out that the plaintiff in *Dooley* fell about eight feet, while in this case, based on the tides at the time of Wallace's accident, the float stage was at most four and a half feet above the bottom of the water. Weeks (Wallace) Opp. at 19; *see also* Amtrak (Wallace) Opp. at 7 ("plaintiff averred that he was unable to identify how far he fell"). However, the distance that Wallace fell is irrelevant. It is true that in assessing whether a plaintiff is subject to an elevation-related risk, the distance from the level of his work to a lower level may bear on whether the kind of protective device listed in the statute is required. *See Rocovich*, 78 N.Y.2d at 514–15 (plaintiff's proximity to eighteen-inch trough did not "call[] for" a protective device). But the underlying question is whether such a device is, in fact, required. *See id.* at 514. If it is, then it must be "so constructed, placed and operated as to give proper protection" against the risks it is designed to prevent. The numerous cases that Weeks and Amtrak cite denied liability under Section 240(1) because no protective device was called for in the first place, so there could be no actionable absence or failure of such a device. By contrast, the risk that workers would fall in the water at Wallace's worksite without a float stage is undisputed— they could not have done their jobs without something to stand on—so a platform was clearly called for. *See Dooley*, 42 A.D.3d at 204 ("An elevated platform . . . was necessary to enable the plaintiff to do his job precisely because gravity otherwise would have been a hindrance to his work, much as it would be, for example, in a situation where a worker has to perform work enumerated in Labor Law § 240(1) on a building with the help of a scaffold.").[4]

---

[4] Weeks places such importance on the distance that Wallace fell that it has moved to strike portions of Wallace's affidavit stating that the water was six to ten feet deep, and that he fell between six and ten feet in total. Dkt. No. 63; *see* Wallace Aff. ¶ 8. As explained in the text, this dispute is irrelevant to the Court's resolution of Wallace's Section 240(1) claim, so the Court need not decide whether the relevant portions of Wallace's affidavit should be stricken under the so-called "sham affidavit" rule. *See Trans-Orient Marine Corp. v. Star Trading & Marine*, 925 F.2d 566, 572–73 (2d Cir. 1991). Accordingly, Weeks's cross-motion to strike is denied as moot.

Moreover, New York courts often impose liability under Section 240(1) when a plaintiff working on an elevated platform is injured as a result of falling from that platform, even though he does not fall to the ground. In these cases, the distance that the plaintiff falls is necessarily limited, as he is able to arrest his fall. Nonetheless, Section 240(1) has been held to apply as a matter of law. *See, e.g., Adams v. North-Star Constr. Co.*, 249 A.D.2d 1001, 1002 (4th Dep't 1998) (reversing denial of summary judgment to plaintiff who fell against wall and landed on scaffold when right foot broke through floor of scaffold); *Noble v. AMCC Corp.*, 277 A.D.2d 20, 20 (1st Dep't 2000) (upholding summary judgment for plaintiff who fell off boiler and suffered injuries despite being able to "hoist himself back onto the boiler"); *Franklin v. Dormitory Auth.*, 291 A.D.2d 854, 854 (4th Dep't 2002) (upholding summary judgment for plaintiff who stepped on faulty scaffold plank and fell backward but did not fall to ground because leg was entangled in scaffold); *Siago v. Garbade Constr. Co.*, 262 A.D.2d 945, 945 (4th Dep't 1999) (upholding summary judgment for plaintiff where defective plank in platform on top of scaffold caused plaintiff to fall eighteen inches to top of scaffold); *Becerra v. City of New York*, 261 A.D.2d 188, 189 (1st Dep't 1999) (reversing denial of summary judgment to plaintiff who was trapped at his shoulders after falling through elevated plywood board); *see also Bonocore v. Vornado Realty Trust*, No. 05 Civ. 6422 (LTS) (GWG), 2009 WL 691933, at *10 (S.D.N.Y. Mar. 13, 2009) (collecting cases). Although the statute does not protect workers who merely slip and fall on the surface of an elevated platform, *see, e.g., Milligan v. Allied Builders, Inc.*, 34 A.D.3d 1268, 1268 (4th Dep't 2006), that principle does not defeat liability in this case, because it is undisputed that Wallace ended up off the float stage and in the water.

Nor is the fact that Wallace was wearing a life vest a meaningful basis for distinguishing *Dooley*, in which the plaintiff was not wearing one. Weeks suggests that because of his flotation

27

device, Wallace never faced a risk of hitting the river bottom. Weeks (Wallace) Reply at 15.

However, the flotation device does not affect whether the float stage was "called for" because of

the differential between the bottom of the water and the level of Wallace's work—it clearly was.

As a result, the float stage was required to offer adequate protection from all falls, not just those

in which a worker risked hitting bottom; as noted above, injuries suffered during falls from an

elevated platform are actionable whether or not the plaintiff hits the ground. Indeed, even

without a flotation device, the *Dooley* plaintiff did not come into contact with the riverbed. *See*

837 N.Y.S.2d at 723. In short, the Court concludes as a matter of law that Wallace faced a risk

covered by Section 240(1).

  Nor is there sufficient evidence to conclude that the float stage on which Wallace was

working offered him adequate protection against that risk. Amtrak and Weeks emphasize that in

*Dooley*, the court's finding of liability was based on the absence of guardrails or tie lines, and

Wallace denied that such protections could or should have been installed on the Weeks float

stages. Amtrak (Wallace) Br. at 12; Amtrak 3/1 56.1 ¶ 22; Weeks 3/1 56.1 ¶ 25. Wallace also

testified that he had all the safety gear necessary to do his job. Weeks 3/1 56.1 ¶ 24. True,

Wallace admitted that extra planking on the side of the float stage would not have prevented his

fall, nor would a lifeline, or a harness, or a safety net. Wallace Dep., Joseph 3/1 Decl. Ex. B, at

259–63. But he never deviated from his testimony that the float stages were unsafe because they

had pieces missing, and "were literally falling apart under your feet, a lot of them." *Id.* at 60.

This claim is corroborated by Monach, who testified at his deposition that Weeks employees

often had to repair parts of the float stages "where the wood was not quite flush and it was

awkward to walk on." Monach Dep., Hansen Aff. Ex. 8, at 43. That testimony is undisputed.

*See* Amtrak 3/22 56.1 Resp. ¶ 30; Weeks 3/22 56.1 Resp. ¶ 30. Moreover, the conditions at the

edge of the float stage were particularly relevant to Wallace's risk of falling, because carrying the rebar cage along the float stage involved treading very close to the edge.[5]   Wallace 56.1 ¶ 13. Monach's testimony suggests that if the float stages had been wider, they would have provided better protection to the workers carrying rebar cages.  *See* Monach Dep., Hansen Aff. Ex. 8, at 112–13.  There is also evidence that slippery algae was a problem on the float stages, including where Wallace fell.

Weeks and Amtrak dispute that the float stage was defective, *see* Amtrak 3/22 56.1 Resp. ¶¶ 28, 31; Weeks 3/22 56.1 Resp. ¶ 28, because Iapicco, Weeks's field engineer, testified that the missing piece on the edge of the float stage was "nothing abnormal" and part of general wear and tear.  Iapicco Dep., Joseph 3/22 Opp. Decl. Ex. C, at 32.  But whether the float stage's condition was normal or abnormal is irrelevant to the legal question of whether the float stage—in whatever condition it was in—adequately protected Wallace against the risk of falling.  Amtrak and Weeks point to no evidence suggesting that the float stage was in a condition to provide such protection, given that pieces were missing from its edges.  *Cf. Siago*, 262 A.D.2d at 945 (affirming summary judgment for plaintiff whose "accident was caused by a defective wooden plank that caused plaintiff to lose his balance and fall"); *Ray v. Niagara Mohawk Power Corp.*, 256 A.D.2d 1070, 1071 (4th Dep't 1998) (reversing denial of summary judgment for plaintiff who "slipped from [a] utility pole" when "a portion of the utility pole on which his left foot was placed came loose").

Indeed, there can be no dispute that the float stage gave Wallace inadequate protection against falling, given that he fell.  *Cf. Gordon v. E. Ry. Supply*, 82 N.Y.2d 555, 561 (1993) ("The

---

[5] The parties dispute whether the area in which Wallace could walk was six or seven inches wide, *see* Wallace 56.1 ¶ 13, or instead closer to twelve inches wide, *see* Amtrak 3/22 56.1 Resp. ¶ 13.  This dispute is irrelevant: even with twelve inches of space, Wallace would have been perilously close to the edge.

ladder did not prevent plaintiff from falling; thus the 'core' objective of section 240(1) was not met."). Neither Weeks nor Amtrak ever argues that Wallace fell in the water for a reason *other* than "a misstep into a 'carved out' or 'missing' piece on the float stage."[6] Amtrak 3/22 56.1 Resp. ¶ 22; *see also id.* ¶¶ 23, 26; Weeks 3/22 56.1 Resp. ¶ 22. Consistent with that account of Wallace's accident, Fitzpatrick, another Weeks dock worker, testified that the float stage was damaged where Wallace fell. Wallace 56.1 ¶ 24; Fitzpatrick Dep., Hansen Aff. Ex. 6, at 46–49. And a post-accident report prepared by Iapicco stated that the cause of Wallace's accident was a "small area of float stage missing on [the] outermost edge." Iapicco Dep., Hansen Aff. Ex. 3, at 50. While there is a dispute over whether Iapicco had sufficient personal knowledge to say which float stage Wallace actually fell from, *see* Amtrak 3/22 56.1 Resp. ¶ 25, Iapicco's testimony at least shows that the missing piece of the float stage he inspected could have caused *a* fall, and therefore that the float stages did not provide adequate protection.

Furthermore, because a careful review of the record has revealed nothing to contradict Wallace's testimony that he fell because he stepped on a "carved out" or "missing" piece of the float stage,[7] or that his injuries resulted from his fall, the Court concludes that there is no genuine issue of fact that the defect in the float stage proximately caused Wallace's injuries. *See Hendrickson v. Marriott Int'l, Inc.*, No. 00 Civ. 5280 (LLS), 2001 WL 789296, at *2 (S.D.N.Y. July 12, 2001) (summary judgment for plaintiff may be granted "even when the plaintiff is the

---

[6] Although Amtrak and Weeks frequently use the word "misstep" as if to suggest that the accident was Wallace's fault, that has no bearing on Amtrak's liability under Section 240(1). A plaintiff's own actions defeat liability only if they are the "sole proximate cause of the accident," *Cahill*, 4 N.Y.3d at 39, which Amtrak and Weeks never argue.

[7] As noted above, this testimony is not inconsistent with evidence that Wallace slipped. For example, the surface that he stepped on, where a piece of the float stage was missing, could have been slippery.

sole witness to the accident" if his testimony is uncontradicted and his credibility is not

undermined). Wallace is therefore entitled to summary judgment on his Section 240(1) claim.

### B. Amtrak's Claims Against Weeks

Amtrak's third-party complaint against Weeks contains claims for breach of contract,

contractual indemnity, implied indemnity, and failure to procure insurance. Third-Party Compl.

at 7–12. Amtrak moves for summary judgment on its breach of contract and contractual

indemnity claims, and does not address its implied indemnity claim in any detail in its briefing.

Moreover, it has agreed to withdraw its claim for failure to purchase insurance. Amtrak (Weeks)

Opp. at 16–17. Therefore, the Court focuses on Amtrak's breach of contract and contractual

indemnity claims. In its motion, Amtrak also asks the Court to declare that Weeks must

reimburse Amtrak for costs and attorneys' fees already incurred with respect to the defense of

Wallace's claims, and to pay such costs going forward. Amtrak (Weeks) Mot. at 2. Weeks

moves for summary judgment on all of Amtrak's claims.

#### 1.   Choice of Law

A threshold question is what law the Court should apply in interpreting the Construction

Contract between Amtrak and Weeks. In this diversity action, the Court applies New York's

choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In

New York, "[a]bsent fraud or violation of public policy, a court is to apply the law selected in the

contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire*

*Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). The

Construction Contract unambiguously provides that "the Contract shall be governed by and

construed in accordance with the laws of the District of Columbia without regard to choice of

law considerations." Joseph 7/25 Decl. Ex. A § 81.1. Weeks does not allege fraud or violation

of public policy.  Amtrak is organized under D.C. law, and it has its principal place of business in the District of Columbia.  Weeks 8/14 56.1 Resp. ¶ 1.  Those "contacts" are sufficient for the Court to enforce the parties' agreement to be governed by D.C. law.  *See Cap Gemini Ernst & Young U.S., LLC v. Nackel*, 346 F.3d 360, 366 (2d Cir. 2003); *Woodling v. Garrett Corp.*, 818 F.2d 543, 552 (2d Cir. 1987).

Weeks's arguments that the Court should apply New York law are meritless.  First, Amtrak did not waive its argument that D.C. law should govern.  Weeks asserts that a choice of law clause is unenforceable if the party invoking the clause fails to include choice of law allegations in its pleadings.  Weeks (Amtrak) Br. at 9.  But it does not cite any cases for that proposition.  Instead, it relies on *Wultz v. Bank of China Ltd.*, 811 F. Supp. 2d 841 (S.D.N.Y. 2011) (Scheindlin, J.), *withdrawn on reconsideration*, 865 F. Supp. 2d 425 (S.D.N.Y. 2012), which addressed—though it ultimately rejected—an argument that a party could not claim for the first time on summary judgment that a certain jurisdiction's law should apply.  The court's analysis concerned cases where "a party assumes in its briefs that a particular jurisdiction's law applies" and then reverses course later in the litigation.  *Wultz*, 811 F. Supp. 2d at 845.  Amtrak has never assumed that D.C. law does not apply to its contractual dispute with Weeks, so *Wultz*'s dicta regarding waiver are irrelevant.

Weeks also argues that Amtrak has not demonstrated any relevant conflict between New York law and D.C. law, and that in the absence of such a conflict, New York law should govern.  Weeks (Amtrak) Reply at 3.  But the choice of law issue in this case matters because of Weeks's own contention that Amtrak cannot be indemnified against claims arising from Amtrak's own negligence—a rule that is enforced in New York, but not in the District of Columbia.  *Compare, e.g.*, N.Y. Gen. Oblig. Law § 5-322.1.1 (a construction contract "purporting to indemnify or hold

32

harmless the promisee against liability for damage arising out of bodily injury to persons or
damage to property contributed to, caused by or resulting from the negligence of the promisee
. . . is against public policy and is void and unenforceable"), *with N.P.P. Contractors, Inc. v.*
*John Canning & Co.*, 715 A.2d 139, 141–42 (D.C. 1998) (contract indemnifying a party for
harm resulting from its negligence is enforceable if clearly expressed). In other words, Weeks's
theory of the case depends on a conflict between New York and D.C. law.

Finally, Weeks argues that the Court should employ New York's "center of gravity"
approach and consider a range of factors in its choice of law analysis. Weeks (Amtrak) Reply at
4. But in the case that Weeks cites, there was no choice of law provision in the contract at issue.
*See Mark Andrew of Palm Beaches, Ltd. v. GMAC Commercial Mortg. Corp.*, 265 F. Supp. 2d
366, 377 (S.D.N.Y. 2003) (Koeltl, J.). Weeks therefore has no authority for its contention that a
"center of gravity" analysis can trump the parties' clear intent for D.C. law to govern. It is true
that courts do not inevitably follow contractual choice of law clauses, but as noted above,
Amtrak's having its principal place of business in the District of Columbia is sufficient to render
the Construction Contract's choice of D.C. law enforceable.

In a diversity case, in the absence of definitive guidance, a federal court must "do its best
to guess how the state court of last resort would decide the issue. Where the high court has not
spoken, the best indicators of how it would decide are often the decisions of lower state courts."
*In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992) (citations omitted).
In certain cases, however, even lower D.C. courts have not provided much guidance on the
issues implicated by Amtrak's claims, and under these circumstances, the Court may "look to the
language of other jurisdictions on the same issue and other sources the state's highest court
might rely upon in deciding the question, including scholarly writings." *DiBella v. Hopkins*, 403

33

F.3d 102, 112 (2d Cir. 2005). The law of Maryland, "to which the District commonly looks for guidance in the absence of its own precedents," is especially persuasive in this regard. *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1171 (D.C. Cir. 2003). Thus, in the following analysis, the Court will turn first to cases applying D.C. law, but in the absence of on-point authority will look to the principles adopted in other jurisdictions, including Maryland.

2.   Breach of Contract Claims

Amtrak and Weeks cross-move for summary judgment on Amtrak's claim that Weeks breached its contractual obligations "to defend, indemnify and hold harmless" Amtrak for Wallace's claims. Amtrak (Weeks) Br. at 1; Weeks (Amtrak) Br. at 10.

In the District of Columbia, "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). The parties' dispute centers on the scope of the duties that Weeks owed Amtrak and on whether Weeks breached those duties. Although the third-party complaint includes a separate allegation that Weeks breached its duty to hold Amtrak harmless, Third-Party Compl. ¶ 36, neither Amtrak nor Weeks discusses in any detail what that duty entails, and the parties' arguments involve only Weeks's duties to defend and indemnify Amtrak. *E.g.*, Amtrak (Weeks) Br. at 16 ("Weeks breached its contractual obligations to defend and indemnify Amtrak for the Wallace claims."); *see also Black's Law Dictionary* 800 (9th ed. 2009) (listing "indemnify" as a synonym for "hold harmless"). The Court's analysis will therefore focus on Weeks's defense and indemnification obligations.

Amtrak suggests that Weeks's duty to defend and indemnify it against Wallace's claims is unitary, in the sense that Weeks's agreeing to defend Amtrak without simultaneously

34

acknowledging its indemnification obligation constituted a breach of the Construction Contract. Amtrak (Weeks) Br. at 16–17; Amtrak (Weeks) Reply at 4; Amtrak (Weeks) Opp. at 9–10. However, under well-established law, a party's duty to defend is distinct from its duty to indemnify, *see Salus Corp. v. Cont'l Cas. Co.*, 478 A.2d 1067, 1069–70 (D.C. 1984), so Weeks's failure to acknowledge its indemnification obligation, standing alone, is not a basis for concluding that it breached its duty to defend. Moreover, in the absence of clear contractual language to the contrary, it would be unreasonable to interpret the Construction Contract as precluding Weeks from reserving its rights upon agreeing to defend Amtrak, because an indemnitor who undertakes an indemnitee's defense without reservation is estopped from later contesting coverage. *See Diamond Serv. Co. v. Utica Mut. Ins. Co.*, 476 A.2d 648, 655 (D.C. 1984).[8]

Given this distinction between Weeks's duty to defend and its duty to indemnify, the Court concludes that Weeks did not breach its duty to defend. Amtrak wrote to Weeks on September 13, 2011, notifying it of Wallace's lawsuit. Weeks immediately engaged BVGK to handle the matter, and BVGK wrote to Amtrak, stating that it had been instructed by Weeks to represent Amtrak. Amtrak, acting through Liberty and RCS, then declined Weeks's offer of a defense in light of uncertainty regarding Weeks's position on indemnification. *See* Amtrak 8/14 56.1 Resp. ¶¶ 12–25. Indeed, Amtrak never actually argues that, but for Weeks's reservation of rights with respect to its indemnification obligation, Weeks's offer of a defense was insufficient

---

[8] To the extent that the law governing insurance differs from the law governing non-insurance indemnity contracts, those differences provide even more reason to define Weeks's duties narrowly. As noted later in this opinion, jurisdictions that recognize a difference between insurance and non-insurance indemnity—and it is unclear whether the District of Columbia is such a jurisdiction—do so on the ground that indemnity contracts are construed strictly, while insurance contracts are construed so as to resolve ambiguities in favor of the insured. *See, e.g.*, *In re Oil Spill by the Oil Rig Deepwater Horizon*, 841 F. Supp. 2d 988, 1008–09 (E.D. La. 2012) (collecting cases)

in any respect.  Accordingly, Amtrak's claim that Weeks breached a contractual duty to defend it

against Wallace's lawsuit cannot succeed, and the Court grants summary judgment to Weeks on

that claim.

The Court also grants summary judgment to Weeks on Amtrak's claim that Weeks

breached its contractual indemnification obligation.  Generally, under D.C. law, "a claim for

indemnification does not accrue until the party seeking indemnification is held liable and makes

a payment." *Casanova v. Marathon Corp.*, 256 F.R.D. 11, 14 (D.D.C. 2009); *accord District of*

*Columbia v. D.C. Transit Sys., Inc.*, 248 A.2d 184, 186 (D.C. 1968).  As discussed in more detail

below, courts often allow defendants to bring third-party claims against their indemnitors in

order to adjudicate the underlying liability and apportion that liability between indemnitor and

indemnitee in the same action.  But even when an indemnitor's obligation is determined in such

proceedings, that obligation nonetheless arises only when the indemnitee makes a payment.

Thus, for Amtrak's breach of contract claim to succeed, Amtrak must have made a payment

subject to the Construction Contract's indemnification clause, and Weeks must have breached its

obligation to indemnify Amtrak for that payment.  Because Amtrak's liability against Wallace

has not yet been determined, Weeks cannot have breached its obligation to indemnify Amtrak.

At core, Amtrak's argument amounts to a claim that Weeks's reservation of rights was

baseless, because D.C. law, which expressly governed the Construction Contract, does not

recognize the public policy ground on which Weeks thought it might not ultimately be liable.

This claim arguably resembles a tort claim for bad-faith denial of indemnity.  *Cf. Washington v.*

*Grp. Hospitalization, Inc.*, 585 F. Supp. 517, 520 (D.D.C. 1984) ("To recover under the tort of

bad faith refusal to pay, plaintiff must show that defendant did not have a reasonable basis for

denying benefits under the policy and that it knew or recklessly disregarded its lack of a

reasonable basis when it denied the claim."). However, D.C. law does not appear to recognize such claims, especially outside the insurance context. *See Fireman's Fund Ins. Co. v. CTIA— The Wireless Ass'n*, 480 F. Supp. 2d 7, 9–12 (D.D.C. 2007) (no tort claim for bad-faith denial of insurance coverage); *Harris v. Howard Univ., Inc.*, 28 F. Supp. 2d 1, 23 (D.D.C. 1998) ("the very existence of a cause of action for 'tortious bad faith refusal to indemnify' is at best suspect"). Moreover, Amtrak has not clearly set forth such a claim in its pleadings or briefing, so the Court will not address it.

### 3.   Indemnification Claims

#### a.   *This Issue Is Not Premature*

Again, Weeks argues that it cannot be held liable for indemnification on summary judgment because its duty to indemnify does not arise until Amtrak has been adjudged liable to Wallace and makes a payment. Weeks (Amtrak) Opp. at 14. A similar argument was recently rejected in *Cevasco v. National Railroad Passenger Corp.*, 606 F. Supp. 2d 401 (S.D.N.Y. 2009), which involved a materially identical contract between Amtrak and another contractor. In that case, as in this one, Amtrak was sued for injuries suffered during a construction accident, and filed a third-party complaint against the contractor who had indemnified it under the contract. In a report and recommendation adopted by Judge Crotty, Magistrate Judge Gorenstein concluded that where "there is a broad indemnification clause that includes a duty to defend, a lawsuit has actually been filed against the indemnitee, and the indemnitee's claim is being brought as a third party action," summary judgment as to liability on Amtrak's indemnification claim was not premature. *Id.* at 410. Although Judge Gorenstein—like the Court in this case— was applying D.C. law, his reasoning relied on New York case law holding that although "[c]laims for indemnification do not generally ripen until a judgment in the underlying action is

paid," third-party indemnification claims may be brought "before they are technically ripe, so that all parties may establish their rights and liabilities in one action." *Harris v. Rivera*, 921 F. Supp. 1058, 1062 (S.D.N.Y. 1995) (quoting *Mars Assocs. v. N.Y.C. Educ. Constr. Fund*, 126 A.D.2d 178, 191 (1st Dep't 1987)); *see Cevasco*, 606 F. Supp. 2d at 410. The Court ultimately agrees with *Cevasco*'s conclusion, but because, as discussed below, the issue is one of federal law, not state law, the Court need not determine whether D.C. law is in accord with New York law.

New York's exception to the ordinary rule against pre-payment indemnification claims results from its procedural rule governing third-party practice, which provides that "a defendant may proceed against a person not a party who *is or may be liable* to that defendant for all or part of the plaintiff's claim against that defendant." N.Y. C.P.L.R. § 1007 (emphasis added). Under New York case law, "[t]he words 'is or may be liable' have been generally construed to allow suit where the third-party plaintiff's cause of action would only mature when he was shown to be liable to the plaintiff," as with claims for indemnification. *Krause v. Am. Guar. & Liab. Ins. Co.*, 279 N.Y.S.2d 235, 238 (1st Dep't 1967).

In this case, however, the Court must look to the federal rule governing third-party practice. Federal Rule of Civil Procedure 14(a)(1) also allows a defendant to bring third-party claims against a "nonparty who is or may be liable to it for all or part of the claim against it," and federal courts often authorize the joinder of indemnitors as third parties under Rule 14, even where state substantive law would adjudge such claims unripe were they brought independently. *See, e.g.*, *Smith v. 819 I.B.T. Pension Plan*, 291 F.3d 236, 242 (2d Cir. 2002); *Moses-Ecco Co. v. Roscoe-Ajax Corp.*, 320 F.2d 685, 687 (D.C. Cir. 1963); *cf. Andrulonis v. United States*, 26 F.3d 1224, 1233 (2d Cir. 1994) (Rule 14(a) "permits a defendant to implead a joint tortfeasor for

contribution before the right to contribution accrues, because that third party 'may be' liable to the defendant for a share of the plaintiff's primary judgment"). In such cases, a court may properly enter judgment against an indemnitor, provided that the judgment is either conditioned on the contingencies that state substantive law requires in order for the third-party plaintiff's claim to accrue, or stayed pending those contingencies.[9] *See Andrulonis*, 26 F.3d at 1234; *Burris v. Am. Chicle Co.*, 120 F.2d 218, 223 (2d Cir. 1941). By the same logic, a court may grant conditional summary judgment on a third-party plaintiff's indemnification claims where no genuine issues of material fact exist to preclude such judgment.

Amtrak confuses the issue somewhat by citing several decisions on the suitability of declaratory relief where the indemnitor is sued directly, not as a third party. *See* Amtrak (Weeks) Reply at 5–6 (citing *Convergent Wealth Advisors LLC v. Lydian Holding Co.*, No. 12 Civ. 1199 (SAS), 2012 WL 2148221 (S.D.N.Y. June 13, 2012); *Tomoka Re Holdings, Inc. v. Loughlin*, No. 03 Civ. 4904 (NRB), 2004 WL 1118178 (S.D.N.Y. May 19, 2004); and *Macmillan, Inc. v. Fed. Ins. Co.*, 741 F. Supp. 1079 (S.D.N.Y. 1990)). In a sense, Amtrak is correct that the only relief the Court can award at this juncture is a kind of "declaration" that Weeks is responsible for any liability to Wallace. But that is true whenever a party obtains summary judgment as to liability only; that Amtrak seeks a holding regarding its legal rights

---

[9] "Federal impleader cannot . . . operate to enlarge the third-party plaintiff's right to recovery beyond that available under the controlling substantive law." *Andrulonis*, 26 F.3d at 1233; *accord Smith v. Whitmore*, 270 F.2d 741, 744–45 (3d Cir. 1959). *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). However, as noted in the text, a court can abide by this rule by conditioning the effectiveness of its judgment on contingencies required by state law. Therefore, the Court declines to follow a case cited by Weeks, in which the court dismissed a third-party defendant's cross-claims for indemnification and contribution as contrary to D.C. law and thus forbidden under *Erie*. *See Casanova*, 256 F.R.D. at 13–15. Moreover, D.C. law does appear to permit cross-claims and third-party claims for indemnification. *See D.C. Transit Sys.*, 248 A.2d at 186 & n.6 (plaintiff's indemnification claim had not accrued because it failed to file a "cross claim for indemnity or contribution" in another proceeding); D.C. Super. Ct. Civ. R. 14(a) (authorizing claims against "a person not a party to the action who *is or may be liable* to the 3rd-party plaintiff for all or part of the plaintiff's claim against the 3rd-party plaintiff" (emphasis added)).

does not make this a declaratory judgment action. *See Johnson v. McCuskey*, 72 F. App'x 475, 478 (7th Cir. 2003) ("Declaratory judgments are not meant simply to proclaim that one party is liable to another."); 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2751 (3d ed. 2013) (the declaratory judgment mechanism is "a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so"). Declaratory judgment cases may, by analogy, help assuage concerns that Amtrak's claims are unripe under Article III, *see Convergent Wealth Advisors*, 2012 WL 2148221, at *5 (indemnitor's "unambiguous obligation yields a live case or controversy for the purposes of declaratory relief"), but the federal impleader doctrine described above is a more coherent basis for the Court's conclusion that Weeks's liability under the Construction Contract's indemnification provision may be determined now.

### b.    *Wallace's Claims Are Covered*

As a matter of law, Wallace's claims fit within the language of the Construction Contract's indemnification provision. *See generally Cevasco*, 606 F. Supp. 2d at 410–14 (undertaking detailed analysis of indemnification provision in Amtrak construction contract). The contract provides that Weeks's obligation to indemnify Amtrak extends to "any" claims that it may "be responsible for or pay as a result of . . . injury or death of any person . . . arising out of or in any degree directly or indirectly caused by or resulting from . . . Work performed by [Weeks]." Joseph 7/25 Decl. Ex. A § 68.1, at 53. Under the contract, the term "Work" means the Pelham Bay Bridge rehabilitation project that Amtrak engaged Weeks to perform. *Id.* § 2, at 1. There is no dispute that Wallace's injuries arose from this work: he fell from the float stage while carrying a rebar cage that was being used to strengthen the bridge's piles. Additionally,

under the Construction Contract, Weeks's indemnity obligation extends to claims paid "as a result of injuries . . . to any of [Weeks's] employees, agents or subcontractors." *Id.* § 68.2, at 54. Wallace was a Weeks employee, so this second clause also covers his claims against Amtrak.

Indeed, Weeks does not dispute that the plain language of the contract's indemnification provision applies to Wallace's claims. Instead, it argues that Amtrak may not be indemnified for its own negligence. Weeks (Amtrak) Opp. at 15–17. Even if Amtrak's negligence were an issue in any of Wallace's surviving claims, Weeks's argument would fail. Under D.C. law, one contracting party may indemnify another for harm resulting from the latter's negligence, as long as the parties' intention to do so is clearly expressed. *N.P.P. Contractors, Inc.*, 715 A.2d at 141–42. The District of Columbia Court of Appeals has repeatedly held that broadly worded indemnification clauses, similar to the one in this case, are sufficiently clear to cover negligence claims. *See id.* at 140 (subcontractor indemnified contractor "from any and all claims and liabilities for property damage and personal injury, including death, arising out of or resulting from or in connection with the execution of the work"); *Grunley Construction Co. v. Conway Corp.*, 676 A.2d 477, 478 (D.C. 1996) (similar); *W.M. Schlosser Co. v. Maryland Drywall Co.*, 673 A.2d 647, 653 (D.C. 1996) (similar). Moreover, even if section 68.1's broad indemnification clause were insufficiently clear, section 68.2 explicitly states that Weeks's indemnity obligation with respect to injuries to its employees applies "irrespective of any negligence or fault on the part of" Amtrak. Joseph 7/25 Decl. Ex. A § 68.2, at 54. This indication that the parties intended for Weeks to pay claims arising from Amtrak's negligence is inescapable. Therefore, whatever Wallace's theory of recovery, as a matter of law Weeks's indemnity obligation covers his claims.

41

c.    *Insurers Do Not Pay Before Indemnitors*

Weeks argues that before Amtrak may recover from it under the Construction Contract's indemnification provision, Amtrak must seek recovery from its liability insurer, Liberty, because "[i]nsurers [p]ay [b]efore [i]ndemnitors." Weeks (Amtrak) Opp. at 17.  This argument is contrary to both applicable law and the unambiguous terms of the Construction Contract.

In addition to requiring Weeks to broadly indemnify Amtrak against losses arising from the bridge project, the Construction Contract obligated Weeks to purchase two kinds of insurance: a general liability insurance policy, under which Weeks would be the insured, and an RPL Policy, under which Amtrak would be the insured.  The former policy was required to include coverage for indemnification payments that Weeks was called upon to make under the Construction Contract.  The effect of these unambiguous provisions was to ensure that any claims brought against Amtrak and covered by the contract's indemnification clause would ultimately be paid by Weeks's liability insurer, in order to avoid the possibility that Weeks itself would have to shoulder, and perhaps be unable to pay, indemnification claims against it. Confirming that Weeks's indemnification obligation takes priority over Liberty's coverage under the RPL Policy, the premium for the ACE policy that covers Weeks's contractual obligation was significantly higher ($675,000) than the premium for the RPL Policy ($47,021).  *Compare* Betancourt 8/14 Opp. Decl. Ex. A, at 1, *with* Joseph 7/25 Decl. Ex. A Item 9.  *See generally Lumbermens Mut. Cas. Co. v. Allstate Ins. Co.*, 51 N.Y.2d 651, 656 (1980) (noting that a low premium "reflect[s] the rarity of [a policy's] ultimate requirement to contribute").

Consistent with this reading, the Construction Contract specifically and unambiguously provides that Weeks's indemnification obligation "shall not be limited by the existence of any insurance policy procured or maintained by [Weeks]."  Joseph 7/25 Decl. Ex. A § 68.3.

Although Weeks is not an insured under the RPL Policy, that policy was nonetheless "procured" by Weeks, given that the Construction Contract required Weeks to purchase the policy, which Weeks did. As a result, adopting Weeks's position—that the RPL Policy limits its indemnification obligation—would render the Construction Contract's "shall not be limited" provision meaningless. *See Abdelrhman v. Ackerman*, 76 A.3d 883, 891 (D.C. 2013) ("When interpreting a contract, we 'strive to give reasonable effect to all its parts and eschew an interpretation that would render part of it meaningless or incompatible with the contract as a whole.'" (quoting *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012))). Weeks offers no explanation for how that provision squares with its argument that the RPL Policy pays first.

In similar cases, courts have consistently held that an indemnitor (and thus its insurer) bears full responsibility for covered indemnification payments, even if the indemnitee has other insurance covering the same loss. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Am. Int'l Spec. Lines Ins. Co.*, 365 F.3d 263, 270–73 (4th Cir. 2004); *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583, 586–90 (8th Cir. 2002); *Cont'l Cas. Co. v. Auto-Owners Ins. Co.*, 238 F.3d 941, 944–45 (8th Cir. 2000); *Indemnity Ins. Co. of N. Am. v. St. Paul Mercury Ins. Co.*, 74 A.D.3d 21, 26 (1st Dep't 2010); *Costello v. Times Square Hotel Co.*, 171 A.D.2d 505, 505 (1st Dep't 1991).[10]

---

[10] Which state's law governs this question is somewhat unclear from the parties' briefs. As noted above, D.C. law governs the Construction Contract, and thus the question of whether Wallace's claims fall within that contract's indemnification provision. *Accord* 15 Steven Plitt et al., *Couch on Insurance* § 219:1 (3d ed. 2013). Once that question is resolved, however, the question of which party's insurance takes priority appears to be a question of New York law. *Cf. St. Paul Fire & Marine*, 365 F.3d at 272 n.4 (applying forum state's law to "the assessment of liability between the insurers based on their policy obligations, which includes questions as to the priority to be given an indemnification agreement between insureds"). Weeks, Amtrak, and Liberty seem to agree, as they rely on New York cases. But even if D.C. law applies, the same result would obtain. *See Lesmark Inc. v. Pryce*, 334 F.2d 942, 945 (D.C. Cir. 1964) ("The fact that the Charrons carried liability insurance which covered the claims of Pryce and Ash did not relieve Lesmark of its obligation to indem[n]ify the Charrons against such claims, and Lesmark does not contend otherwise."); *see also Wal-Mart*, 292 F.3d at 589 n.1 (accepting parties' assumption that Arkansas Supreme Court would accept "general principles of insurance law"); *St. Paul Fire & Marine*, 365 F.3d at 272 (Virginia Supreme Court would adopt "general practices and the majority position on the respective issues").

In one closely-on-point decision, the Eighth Circuit addressed the interaction between a railroad protective policy and a contractual indemnification agreement. *Cont'l Cas. Co.*, 238 F.3d 941. In that case, a railroad had hired a contractor to salvage goods from rail cars. As in this case, the contract between the contractor and the railroad contained an indemnification provision and required the contractor to purchase both insurance for its own indemnification obligations and a railroad protective policy covering the railroad. The Eighth Circuit held that the indemnification clause made the contractor responsible for any claims within the clause's scope, so the contractor's insurer, not the railroad's insurer, was required to bear the loss resulting from an injury settlement. *See id.* at 944–45. This result was consistent, the court concluded, with the intent of the parties' contracts and "the understanding of those who are familiar with the railroad industry and the way that salvage operations work there." *Id.* at 945. Those same considerations govern here. Weeks's duty to indemnify Amtrak takes priority over the RPL Policy.

Weeks's primary argument to the contrary is that the RPL Policy contains an "other insurance" provision, which states that the coverage provided by Liberty is "[p]rimary insurance," and that Liberty "will not seek contribution from any other insurance available to [Amtrak] except if the other insurance is provided by a contractor other than the designated contractor for the same operation and 'job location.'" Weeks (Amtrak) Opp. at 18 (quoting Joseph 7/25 Decl. Ex. H § IV.A.6.a). In Weeks's view, this provision suggests that Liberty cannot seek contribution from insurance provided by Weeks—which was the designated contractor—before Liberty must pay under the RPL Policy. That would mean that the RPL Policy was intended to pay before Weeks's indemnification obligation under the Construction Contract was triggered. Weeks also argues that the other insurance provision in its CGL Policy is consistent with this reading, because it states that the policy's coverage is "in excess of" other

44

insurance "available to [Weeks]."  Weeks (Amtrak) Opp. at 18 (quoting Betancourt 8/14 Opp.
Decl. Ex. A ¶ 14).

Weeks's argument is not persuasive.  As a textual matter, the fact that the RPL Policy is
primary *insurance* does not mean that Liberty must pay before a contractual *indemnitor*.  Nor is
that distinction affected by the fact that Weeks's obligation is ultimately covered by ACE, as
required by the Construction Contract, and that Liberty, as subrogee for Amtrak, likely would
recover from ACE for payments that Weeks might owe to Amtrak.  As noted above, Liberty is
precluded from seeking contribution only from other insurance "available to Amtrak," and the
CGL Policy covering Weeks's indemnification obligation is available to Weeks, not to Amtrak.
(Amtrak is not even mentioned in the policy, which names Weeks as the insured.  *See* Betancourt
8/14 Opp. Decl. Ex. A.)  Likewise, the fact that Weeks's liability policy is in excess of other
insurance "available to" Weeks is irrelevant because the RPL Policy is available to Amtrak, not
to Weeks.  Weeks is not an insured under the policy, which specifies that Amtrak is the "Named
Insured"; that the term "insured" is limited to the Named Insured, its officers, directors,
stockholders, and railroads operating over its tracks; and that Liberty would cover "sums that *the
insured* becomes legally obligated to pay as damages" for applicable personal injury claims.
Joseph 7/25 Decl. Ex. H Item 1, § I.A.1.a, § II.1–4 (emphasis added); *see also Cont'l Cas. Co.*,
238 F.3d at 944 (railroad was insured under railroad protective policy "although [contractor] paid
for it").

Weeks's "other insurance" argument is also contrary to the case law.  Although
*Continental Casualty Co.* did not explicitly discuss the railroad protective policy's or liability

45

policy's other insurance clauses, Weeks (Amtrak) Opp. at 18,[11] other courts have addressed such

provisions and found them to be irrelevant to whether a contractual indemnification obligation

takes priority over the indemnitee's insurance. *See, e.g.*, *Wal-Mart*, 292 F.3d at 590 ("RLI

cannot avoid liability for the settlement by pointing to language in its policy calling itself

'excess.'  RLI is 'excess' to National Union only if we determine that National Union is liable

first, and . . . we do not do so because we believe the indemnity agreement governs."); *Indemnity

Ins. Co.*, 74 A.D.3d at 26 (holding that priority of insurance coverage was "irrelevant" because

subcontractor's indemnification obligation resulted in "complete pass-through of liability" to

subcontractor and its insurer); *accord* 15 Steven Plitt et al., *Couch on Insurance* § 219:1 (3d ed.

2013) ("[A] contract with an indemnification clause . . . may shift an entire loss to a particular

insurer notwithstanding the existence of an 'other insurance' clause in its policy.").

 The authority that Weeks relies on is not to the contrary.  *See* Weeks (Amtrak) Opp. at

17–18.  Two of the cases that it cites actually recognize that an indemnitee's insurer may, as

subrogee, recover from the indemnitor for losses covered by a contractual indemnification

provision.  *See Bovis Lend Lease LMB, Inc. v. Great Am. Ins. Co.*, 53 A.D.3d 140, 154–55 (1st

Dep't 2008); *Wilson v. Sirius Am. Ins. Co.*, 844 N.Y.S.2d 349, 351 (2d Dep't 2007).  Those

decisions' consideration of other insurance clauses therefore does not aid Weeks, which, for the

reasons discussed in this opinion, has an enforceable obligation to indemnify Amtrak.  The other

cases that Weeks cites as giving effect to other insurance provisions are inapposite because they

involved the priority of coverage between insurance policies, not between insurance and

---

[11] Weeks also argues that *Continental Casualty Co.* applied Minnesota law, not New York law.  Weeks (Amtrak)
Opp. at 19.  However, New York law is in accord that an insurer who covers an indemnitor's contractual
indemnification obligation does not share that liability with the indemnitee's liability insurer.  *See Indemnity Ins.
Co.*, 74 A.D.3d at 26.

indemnity. *See Si Jie Mei, Inc. v. Fire & Cas. Ins. Co. of Conn.*, No. 03 Civ. 196 (LLS), 2003 WL 22208376, at *2–3 (S.D.N.Y. Sept. 23, 2003); *Travelers Indem. Co. v. Am. & Foreign Ins. Co.*, 286 A.D.2d 626, 626 (1st Dep't 2001); *Am. Ref-Fuel Co. of Hempstead v. Res. Recycling*, 248 A.D.2d 420, 424–25 (2d Dep't 1998). Accordingly, the Court concludes as a matter of law that Weeks's obligation to indemnify Amtrak for Wallace's claims is not affected by the RPL Policy.

### d.    *Amtrak Retains Its Right to Indemnification*

Weeks also argues that its duty to indemnify Amtrak against Wallace's claims was extinguished when Amtrak transferred control of its defense from counsel chosen by Weeks to counsel chosen by Liberty. Weeks (Amtrak) Br. at 11–12; Weeks (Amtrak) Opp. at 21. The Court disagrees. Although an indemnitee's insistence on its own counsel may, under certain circumstances, extinguish an indemnitor's duty to fund the indemnitee's *defense*, Weeks's contention that "an indemnitee's refusal to accept a defense from the indemnitor extinguishes the indemnitor's duty to *indemnify*" is entirely unfounded. Weeks (Amtrak) Opp. at 12 (emphasis added).

The authorities that Weeks cites offer it no support. First, Weeks asserts that "an indemnitee is not entitled to control its own defense and have the indemnitor reimburse the indemnitee for its attorney's fees and costs after the indemnitor accepted the indemnitee's tender of defense pursuant to an agreement." Weeks (Amtrak) Opp. at 12 (quoting C.J.S. Indemnity § 24) (internal quotation marks omitted). But that rule concerns the allocation of defense costs, not the effectiveness of the indemnity obligation. *See Williams v. Rexworks, Inc.*, 277 Wis. 2d 495, 508 (2004), *cited in* C.J.S. Indemnity § 24 nn.28, 29. Weeks also argues that, under D.C. law, an indemnitee waives its right to indemnification by materially increasing the risk of loss or

by interfering with the indemnitor's proposed defense strategy.  Weeks (Amtrak) Opp. at 12–13

(citing *Unisys Corp. v. Legal Counsel, Inc.*, 768 F. Supp. 6, 8 (D.D.C 1991); and *Steele Founds.,*

*Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 156 n.9 (D.C. 2007)).  But the cases it cites are

readily distinguishable, and they nowhere suggest that an indemnitee's controlling its own

defense per se increases the indemnitor's risk of loss or constitutes sufficient interference with

the indemnitor's defense strategy.  *See Unisys*, 768 F. Supp. at 8 (sublessor's failure to notify

indemnitor that sublease had been breached deprived indemnitor of opportunity to mitigate

losses); *Steele Founds.*, 937 A.2d at 156 n.9 (suggesting that indemnitee's settling underlying

claim for unreasonable amount equates to a failure to mitigate damages and thus provide

indemnitor with affirmative defense).[12]  In this case, there is a complete lack of evidence that

Amtrak's defense against Wallace's claims has increased the loss that Weeks must cover under

its indemnity obligation, so Amtrak's entitlement to indemnification is not extinguished.

> e.     *Weeks's Affirmative Defenses Fail*

Weeks claims that several affirmative defenses preclude Amtrak's indemnification claims

against it.  None has merit.

First, Weeks claims that Amtrak waived its right to a defense and indemnification from

Weeks by choosing to replace BVGK with LCBF, and thus accept a defense being provided by

Liberty.  Weeks (Amtrak) Opp. at 21.  But "a waiver requires an intentional relinquishment of a

known right," *Grunley Constr. Co. v. District of Columbia*, 704 A.2d 288, 291 n.5 (D.C. 1997),

and no reasonable jury could conclude that Amtrak's conduct implies that Amtrak has waived its

---

[12] Similarly, *L.B. Kaye Associates, Ltd. v. Libov*, 527 N.Y.S.2d 216, 217 (1st Dep't 1988); Weeks (Amtrak) Opp. at 13, states that if an indemnitee fails to notify the indemnitor of a claim or rejects the indemnitor's defense, "in order to recover reimbursement he must establish that he would have been liable and that there was no good defense to the liability."  That case therefore assumes, directly contrary to Weeks's argument, that where actual liability is demonstrated, an indemnitee who controls its own defense remains entitled to indemnification.

right to indemnification from Weeks. To the contrary, Amtrak has continuously insisted that Weeks owes it indemnification. As discussed above, rejecting Weeks's offer of a defense hardly implies a decision to extinguish Weeks's indemnification obligation, because the effectiveness of that obligation does not depend on who controls Amtrak's defense.

Second, Weeks argues that Amtrak should be estopped from seeking a defense and indemnification from Weeks. Weeks (Amtrak) Opp. at 21. Under D.C. law, an equitable estoppel defense requires that the defendant, acting in good faith, detrimentally relied on affirmative acts of the plaintiff, and that the equities strongly favor the defendant. *See, e.g.*, *Goto v. Dist. of Columbia Bd. of Zoning Adjustment*, 423 A.2d 917, 924 n.15 (D.C. 1980). However, to succeed on an estoppel theory, a party's reliance must be reasonable. *Chamberlain v. Barry*, 606 A.2d 156, 158–59 (D.C. 1992). Weeks argues that when Amtrak rejected its defense and chose instead to proceed with representation furnished by Liberty, Weeks "believed that Amtrak would be covered and defended by [Liberty] pursuant to the [RPL] Policy that Weeks purchased for Amtrak." Weeks (Amtrak) Opp. at 22. But that belief is unreasonable in light of the numerous cases discussed above, which establish that a contractual indemnification obligation takes priority over insurance covering the same loss and permit an indemnitee's insurer to recover from the indemnitor as subrogee. In other words, Weeks should have known that it would continue to be liable for indemnity, and nothing Amtrak did suggested otherwise. Moreover, Weeks never says how it relied to its detriment on Amtrak's behavior.

Third, Weeks contends that Amtrak "elected its remedy" when it rejected Weeks's defense for the defense provided by Liberty. Weeks (Amtrak) Opp. at 23. Generally, a plaintiff may not recover twice for the same wrong, *see Am. Serv. Ctr. v. Helton*, 867 A.2d 235, 242 (D.C. 2005), but courts have rejected this principle as a basis for extinguishing an indemnification

49

obligation simply because the same loss happens to be covered by a liability insurer, *see Fontenot v. Mesa Petrol. Co.*, 791 F.2d 1207, 1220–21 (5th Cir. 1986) (collecting cases). Accepting Weeks's argument would prevent insurance companies from pricing their coverage to reflect the likelihood that a contractual indemnitor will be the one paying the covered loss.

Finally, Weeks argues that Amtrak failed to mitigate its damages because if it had accepted Weeks's defense, Weeks would not have been relieved of its indemnification obligation. Weeks (Amtrak) Opp. at 23–24. This argument is incoherent: to explain why Weeks's indemnity obligation should be extinguished, it assumes that that obligation has been extinguished. In fact, the damages in question would be those arising from Wallace's claims (which Amtrak argues Weeks should cover), but the Court has already determined that there is no evidence in the record suggesting that Amtrak's defense strategy has exposed Weeks to a materially greater risk of loss from those claims.

* * *

To summarize, the Court concludes that, as a matter of law, Wallace's claims against Amtrak are covered by the indemnification provision in the Construction Contract. Additionally, no reasonable jury could find that Weeks has been relieved of its obligation to indemnify Amtrak against those claims. Accordingly, the Court grants summary judgment to Amtrak on its contractual indemnification claim against Weeks.

### 4. Defense Costs

Having established Weeks's obligation to indemnify Amtrak against Wallace's claims, the Court must address whether Weeks is also required to pay for the costs of Amtrak's defense. Weeks does not contest that the Construction Contract gave it a duty to defend Amtrak from Wallace's claims when they were filed. The duty to defend is broader than the duty to

indemnify, meaning that "if the allegations of a plaintiff's complaint may bring the claim within

the coverage of the defendant's policy, the insurance company must honor its duty to defend,

even if ultimately relieved of any duty to indemnify." *Salus Corp*, 478 A.2d at 1070 (quoting

*Sherman v. Ambassador Ins. Co.*, 670 F.2d 251, 259 (D.C. Cir. 1981)) (internal quotation marks

omitted). The Court has determined that all of Wallace's claims are covered by Weeks's

indemnity obligation, so it follows that Weeks was obliged to defend Amtrak against all of his

claims as well. However, although the Court has rejected Weeks's argument that Amtrak's

choice to replace BVGK extinguished Weeks's indemnification obligation, whether that choice

extinguished Weeks's obligation to pay defense costs is a separate question.

Most jurisdictions recognize that when a conflict arises between the interests of an

insurer and its insured, the insurer's duty to defend requires it to pay for counsel of the insured's

choosing. *See, e.g., Klein v. Salama*, 545 F. Supp. 175, 179 (E.D.N.Y. 1982) (applying New

York law); *Public Serv. Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 401 (1981); *Brohawn v.

Transamerica Ins. Co.*, 276 Md. 396, 414–15 (1976); Todd R. Smyth, Annotation, *Duty of

Insurer to Pay for Independent Counsel when Conflict Exists Between Insurer and Insured*, 50

A.L.R.4th 932 (1986) (collecting cases); *cf. N.Y. State Urban Dev. Corp. v. VSL Corp.*, 738 F.2d

61, 65–66 (2d Cir. 1984) (insurer need not pay for any counsel chosen by insured where contract

provides otherwise); *Castleberry v. Goldome Credit Corp.*, 418 F.3d 1267, 1274 (11th Cir. 2005)

(same for indemnitor). The question of when a sufficient conflict exists is less clear. An

insurer's offer to defend a claim while reserving its right to contest coverage can be sufficient,

but some cases require a careful assessment of how the reservation of rights would actually

affect defense counsel's conduct. *See, e.g., Exec. Risk Indem. Inc. v. Icon Title Agency, LLC*,

739 F. Supp. 2d 446, 450 (S.D.N.Y. 2010) (New York law); *Axis Reins. Co. v. Telekenex, Inc.*,

51

913 F. Supp. 2d 793, 803–04 (N.D. Cal. 2012) (California law); *Driggs Corp. v. Pa. Mfrs. Ass'n Ins. Co.*, 3 F. Supp. 2d 657, 658–59 (D. Md. 1998) (Maryland law). The parties do not cite any cases addressing this issue under D.C. law, and the Court has discovered only one, which appears to hold that a reservation of rights is sufficient. *See O'Connell v. Home Insurance Co.*, No. 88-3523, 1990 WL 137386, at *1, *4 (D.D.C. Sept. 10, 1990) (where insurer offered defense but reserved right to "deny indemnification for any ultimate liability based on deliberately wrongful acts excluded under the Policy," insurer was required to pay for insured's chosen counsel, although court opined that there was "no inherent conflict of interest"). On the facts of this case, the Court concludes that Weeks must pay for Amtrak's defense against Wallace's claims.

Basic principles of insurance law lead to this conclusion. An insurer's reservation of rights is an important step in determining how an insured will undertake its defense of a claim. It is well established in the District of Columbia (and elsewhere) that an insurer who accepts an insured's tender of a defense without reserving the right to contest its coverage under the insurance policy is estopped from later denying coverage. *See Cincinnati Ins. Co. v. All Plumbing, Inc.*, — F. Supp. 2d — , No. 12-851 (CKK), 2013 WL 5665195, at *4 (D.D.C. Oct. 18, 2013); *St. Paul Fire & Marine Ins. Co. v. Children's Hosp. Nat'l Med. Ctr.*, 670 F. Supp. 393, 402 (D.D.C. 1987); *Walker v. Am. Ice Co.*, 254 F. Supp. 736, 741–42 (D.D.C. 1966); *Diamond Serv. Co. v. Utica Mut. Ins. Co.*, 476 A.2d 648, 655 (D.C. 1984). That is because an insurer's reservation of rights suggests that its representation may not be as robust as if the insurer expected to bear the insured's losses, or that exclusions from policy coverage may result in a preference between the plaintiff's theories of recovery. *See Athridge v. Aetna Cas. & Sur. Co.*, No. 96-2708 (RMU/JMF), 2006 WL 2844690, at *2 (D.D.C. Sept. 29, 2006) ("The purpose

52

of such an estoppel rule is to prevent an insurance carrier from defending an action while avoiding coverage of the end result without adequate warning to the insured of the potential conflict of interest.").

On October 8, 2011, after Amtrak, in consultation with Liberty and RCS, had replaced BVGK with LCBF, Weeks explicitly reserved its right to contest liability for damages arising from Wallace's claims. Specifically, Langan stated his belief that if Wallace "can prove that his alleged injuries were the result of the sole negligence or gross misconduct of Amtrak," then Weeks's contractual duty to indemnify Amtrak for his claims could be challenged on public policy grounds. Joseph 7/25 Decl. Ex. G. This statement reflected a clear preference, from Weeks's perspective, for Amtrak to be held liable for negligence or gross misconduct, and not on the basis of some other theory. And whether Amtrak was negligent or not would be determined in the proceedings in which BVGK would be representing Amtrak. Even courts that have been careful to inquire into the nature of an asserted conflict of interest before transforming an insurer's duty to defend into a duty to pay for the insured's chosen counsel have concluded that a conflict exists on similar facts. *See, e.g.*, *Exec. Risk Indem.*, 739 F. Supp. 2d at 450 ("[T]he insured's right to independent counsel is only triggered when the reservation of rights creates a potential conflict of interest for the counsel provided by the insurer, and in particular, where the defense attorney's duty to the insured would be to defeat liability on *any* ground but his duty to the insurer would be to defeat liability on *only those* grounds for which the insurer might be liable."); *Axis Reins. Co.*, 913 F. Supp. 2d at 803–04 ("A conflict of interest does not arise unless the outcome of the coverage issue can be controlled by counsel first retained by the insurer for the defense of the underlying claim" (quoting *Blanchard v. State Farm Fire & Cas. Co.*, 2 Cal. App. 4th 345, 350 (Ct. App. Cal. 1991)) (internal quotation mark omitted)); *see also* Smyth,

53

*supra*, §§ 2[a], 5. Therefore, as of October 8, 2011, Amtrak was entitled to appoint counsel of its choosing at Weeks's expense.[13]

That entitlement is not affected by the fact that Amtrak actually replaced BVGK with LCBF on October 6, two days before Weeks explicitly reserved its rights for the first time. From the point that Amtrak tendered its defense, Weeks was conspicuously silent regarding its indemnity obligation. As a result, Amtrak understandably became uneasy about the prospect that counsel chosen by Weeks would represent it against Wallace's claims. To hold that Weeks's silence bound Amtrak to either accept Weeks's chosen defense counsel or forgo its contractual right to a defense because Weeks had not yet reserved its rights would create a disincentive for indemnitors facing conflicts of interest to notify their indemnitees, contrary to the principle that an indemnitee should enjoy "the ability to control and manage his or her own case without delay." *Cincinnati Ins. Co.*, 2013 WL 5665195, at \*4. Moreover, a conflict of interest requires the appointment of new counsel whenever it arises. *See, e.g., Brohawn*, 276 Md. at 414 ("*When such a conflict of interest arises*, the insured must be informed of the nature of the conflict and given the right either to accept an independent attorney selected by the insurer or to select an attorney himself to conduct his defense." (emphasis added)).

Before moving on, the Court concedes that it is unclear whether the District of Columbia would import the law governing insurers' duty to defend into the non-insurance indemnity

---

[13] Although the parties do not address this issue in any detail, it is unclear how much of a conflict BVGK actually faced, given that Weeks's ground for reserving its rights—that the indemnification clause did not cover losses arising from Amtrak's negligence—was baseless in light of the contract's choice of D.C. law. However, the Court concludes that Amtrak was nonetheless entitled to reject Weeks's defense. It will frequently be uncertain whether an insurer's reservation of rights is based on a correct interpretation of its policy coverage, and the fact that Weeks's error was particularly glaring should not work in its favor by preventing Amtrak from asserting control over its own defense. Moreover, Weeks (through BVGK) continues to erroneously argue that D.C. law does not apply, and that even if it does, Weeks's indemnification obligation does not cover losses arising from Amtrak's negligence.

context, as the above analysis assumes.  Many jurisdictions do, *see Shaughnessy v. KC Rainbow Dev. Co.*, No. 09-51 ACK-LEK, 2010 WL 157486, at *5 (D. Haw. Jan. 15, 2010); *J.R. Simplot Co. v. Chevron Pipe Line Co.*, No. 04 Civ. 624 (DAK), 2006 WL 2796887, at *12 n.12 (D. Utah Sept. 27, 2006); *In re Oil Spill by the Oil Rig Deepwater Horizon*, 841 F. Supp. 2d 988, 1008–09 (E.D. La. 2012) (collecting cases), although some do not, *see, e.g.*, *Deepwater Horizon*, 841 F. Supp. 2d at 1009 (rejecting this approach under federal maritime law); *Tateossian v. State*, 183 Vt. 57, 62–63 (2007).  The chief difference between insurance contracts and non-insurance indemnity contracts appears to involve the rules by which they are construed.  Because insurance contracts are often contracts of adhesion drafted by insurance companies, they are construed liberally in favor of the insured, while indemnification contracts like the Construction Contract are construed strictly.  *See Castleberry*, 418 F.3d at 1271–72 (applying New York law); *Marksmen, Inc. v. Interbrand Corp.*, No. 10 Civ. 214 (DLC), 2010 WL 2595103, at *3 (S.D.N.Y. June 28, 2010) (California law).  Both of these propositions are true under D.C. law.  *Compare Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1041 (D.C. Cir. 1981) ("ambiguity in an insurance contract must be construed in favor of the insured"), *with Am. Bldg. Maintenance Co. v. L'Enfant Plaza Props., Inc.*, 655 A.2d 858, 861 (D.C. 1995) (indemnity agreements are strictly construed).  *But cf. Hooks v. Se. Constr. Corp.*, 538 F.2d 431, 433 n.1 (D.C. Cir. 1976) (noting that distinction between indemnity insurance and liability insurance also "would be applicable to contracts of indemnity entered into by private parties").

In any event, the Court concludes that any difference between insurance and indemnity is irrelevant to the contours of Weeks's obligation to pay for Amtrak's defense, for several reasons.  First, read literally, the Construction Contract's definition of "Claims" explicitly includes "costs of defense and attorneys' fees."  Joseph 7/25 Decl. Ex. A § 68.1, at 53.  Weeks has an obligation

to "defend, indemnify *and* hold harmless" Amtrak against "any . . . Claims." *Id.* (emphasis added). Therefore, were the Court to hold that Amtrak's decision to reassert control over its defense relieved Weeks of its contractual duty to "defend," Weeks nonetheless would retain its obligation to reimburse Amtrak for defense costs and attorneys' fees under its separate obligation to "indemnify." Perhaps that obligation would not arise until Amtrak has paid out those expenses, whereas in the insurance context, the duty to defend arises upon a claim's being filed. But that is all that Amtrak wants at this point: having already obtained its own counsel, it asks the Court to hold that Weeks must pay for that counsel. *Cf. Deepwater Horizon*, 841 F. Supp. 2d at 1009 (concluding that duty to defend was narrower in non-insurance context and holding that indemnitor was required to reimburse indemnitee's defense costs after liability was determined). Second, to hold that Weeks's duty to pay for Amtrak's defense has been extinguished would encourage indemnitors to manufacture conflicts of interest lest their indemnitees take them up on their offer of a defense. Third, any difference in bargaining power is of relatively minimal concern because the Construction Contract requires Weeks's indemnity obligation to be covered by a liability insurer. Therefore, even if insurance law principles do not apply wholesale to non-insurance indemnification contracts, Weeks still must pay for Amtrak's defense costs and fees.

### C. Weeks's Claims Against Liberty

In light of the foregoing analysis, Weeks's claims against Liberty do not require significant discussion. The parties agree that New York law governs these claims, so the Court need not undertake a choice of law inquiry. *See Phila. Indem. Ins. Co. v. City of New York*, No. No. 09 Civ. 10432 (PGG), 2011 WL 1237586, at *3 n.3 (S.D.N.Y. Mar. 24, 2011).

Count I and Count II of Weeks's fourth-party complaint allege that Liberty breached the RPL Policy. Count I alleges that Weeks and Liberty were parties to the RPL Policy, and Count

II alleges, in the alternative, that Weeks was a third-party beneficiary of that policy. *See* Amend. Answer & Fourth-Party Compl. ¶¶ 88–99. For either claim to succeed, Liberty must have breached the RPL Policy. Weeks's theory is that Liberty breached the policy's other insurance provision by failing to provide "primary" coverage to Amtrak and instead seeking recovery from Weeks under the Construction Contract's indemnification clause. Weeks (Liberty) Opp. at 6, 11. However, as discussed above, the fact that Liberty contracted to provide primary insurance does not negate the priority of Weeks's indemnification obligation over Liberty's coverage. And to the extent that Liberty ultimately seeks recovery from ACE, Weeks's insurer, the RPL Policy precludes Liberty from seeking contribution only from other insurance that is "available to" Amtrak, and the ACE policy is available to Weeks, not Amtrak. Therefore, Liberty's efforts to hold Weeks to its indemnification obligations do not constitute a breach of the RPL Policy. Because Weeks cannot show that Liberty breached its obligations under the RPL Policy, its breach of contract claims cannot succeed. As a result, the Court grants summary judgment to Liberty and need not address its other arguments.

The Court also grants summary judgment to Liberty on Weeks's claim of bad faith, contained in Count III of Weeks's fourth-party complaint. "As in all contracts, implicit in contracts of insurance is a covenant of good faith and fair dealing, such that 'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.'" *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 194 (2008) (quoting *New York Univ. v Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)). As Weeks points out, this duty extends not only to the insured, but also to any excess insurer covering the same loss. *See Pavia v. State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445, 452 (1993). Weeks is neither

Liberty's insured nor an excess insurer.  However, assuming *arguendo* that Weeks might have a claim against Liberty under some circumstances, its claims fail here.

First, Weeks claims that Liberty engaged in "unreasonable, intentional and/or malicious excessive delay and/or the improper denial of coverage of Wallace's claims."  Weeks (Liberty) Opp. at 22.  But it points to no evidence of delay, and Liberty has not denied coverage of Wallace's claims.[14]  In fact, it has agreed to defend Amtrak against them while simultaneously pursuing recovery from Weeks under the Construction Contract's indemnification provision. Liberty 56.1 ¶ 43.

Second, Weeks contends that Liberty has asserted frivolous defenses, including the argument that its coverage under the RPL Policy is not primary insurance.  Weeks (Liberty) Opp. at 22.  But Liberty has not argued that its coverage is not primary; it has simply asserted (correctly) that Weeks, as contractual indemnitor, is nonetheless obliged to pay first.

Third, Weeks claims that the law firm that Liberty appointed to represent Amtrak has a conflict of interest, as evidenced by the fact that it has not yet sued Liberty or ACE.  *Id.*  But Amtrak has no reason to sue Liberty, given that Liberty has not denied responsibility for Wallace's claims, and any failure to sue ACE is understandable, on the assumption that Weeks itself will be able to recover from ACE in order to fund any award against it.

Finally, Weeks argues that Liberty wrested control of Amtrak's defense away from it, thereby prejudicing Weeks's interests.  But that was Amtrak's choice, which it was entitled to make.  Weeks contends that it has a right to control Amtrak's defense because it must pay for it,

---

[14] Liberty did send Amtrak a letter reserving its rights. *See* Muilenburg Decl. Ex. J.  However, the letter simply contains general language to the effect that a "coverage review" was required, and that the RPL Policy obliged Amtrak to abide by certain reporting requirements. *Id.*  There was no indication that Liberty might plan to steer the litigation in a preferred direction.  That was not true of Weeks's reservation of rights, which implied an incentive to demonstrate negligence on Amtrak's part and thereby avoid indemnification.

Weeks (Liberty) Opp. at 22; *see Fed. Ins. Co. v. N. Am. Specialty Ins. Co.*, 83 A.D.3d 401, 402 (1st Dep't 2011) ("an insurer has exclusive control over a claim against its insured once it assumes defense of the suit"), but as discussed above, that principle does not apply where an indemnitor has a conflict of interest, in which case the indemnitee may appoint counsel of its own choosing at the indemnitor's expense.  Therefore, Liberty is entitled to summary judgment on Weeks's claims.

In its motion for summary judgment, Weeks asks the Court for a declaratory judgment that "Liberty is entitled to recover from Weeks all payments it has made in defending Amtrak." Liberty Mot. at 2; Liberty Br. at 2.  Typically, a party seeking a declaratory judgment requests such relief by asserting a declaratory judgment count in its pleading, which Liberty has not done. The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an *appropriate pleading*, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (emphasis added).  Federal Rule of Civil Procedure 57 provides that "[t]he procedure for obtaining a declaratory judgment . . . shall be in accordance with these rules."  "[T]aken together, these provisions require the filing of a complaint to commence a declaratory judgment action.  In appropriate circumstances, declaratory judgment may be sought by way of counterclaim or cross-claim." *Moore v. State Farm Mut. Auto. Ins. Co.*, No. 03-2390, 2008 WL 191253, at *1 (E.D. La. Jan. 22, 2008) (quoting *Redmond v. Alexander*, 98 B.R. 557, 559 (D. Kan. 1989)).  *But see Turner v. Liverpool Cent. Sch.*, 186 F. Supp. 2d 187, 190 n.5 (N.D.N.Y. 2002) (considering post-pleading motion for declaratory judgment because "[e]ven where declaratory relief is not requested the courts may grant such relief where the pleading and proof show such to be appropriate").  Given that the parties have not briefed this issue, the Court will

59

exercise its discretion and decline to enter a declaratory judgment. *See Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 507 (S.D.N.Y. 2013) ("It is within the broad discretion of the trial court whether to exercise declaratory jurisdiction." (quoting *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006)) (internal quotation marks omitted))

Nonetheless, the Court will conclude with three observations. First, having granted summary judgment to Amtrak on its claims against Weeks with respect to both indemnity and attorneys' fees and costs, the contours of Weeks's obligations to Amtrak under the indemnification provision of the Construction Contract have been determined. Second, the language in the RPL Policy's transfer of rights provision speaks for itself: "[i]f the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us." Joseph 7/25 Decl. Ex. E § IV.A.8. Third, however, Liberty's request that Weeks reimburse it for "all payments it has made in defending Amtrak" is arguably broader than Amtrak's request for attorneys' fees and costs incurred "with respect to the defense of Wallace's claims." Amtrak (Weeks) Mot. at 2. The Court emphasizes that it is not reaching any conclusion at this stage regarding fees incurred in litigating Amtrak's third-party claims against Weeks.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants Wallace's motion for summary judgment as to liability on his claim under New York Labor Law Section 240(1), and denies the parties' motions with respect to Wallace's slipping claim under Labor Law Section 241(6) because genuine issues of material fact persist. However, the Court grants summary judgment to Amtrak

on Wallace's claims under the common law and Labor Law Section 200, and on Wallace's tripping claim under Labor Law Section 241(6).

Additionally, Amtrak's motion for summary judgment on its claims against Weeks is granted in part and denied in part: summary judgment is granted on its claims for contractual indemnification and defense costs, and denied with respect to its breach-of-contract and failure-to-purchase-insurance claims. Conversely, the portion of Weeks's motion involving Amtrak's breach-of-contract and failure-to-purchase-insurance claims is granted, and the portion of its motion involving Amtrak's indemnification and cost-of-defense claims is denied.

Finally, Weeks's motion for summary judgment against Liberty is denied in its entirety, and Liberty's motion with respect to Weeks's claims against it is granted except insofar as that motion requests declaratory relief against Weeks.

Pursuant to Rule 5 of this Court's Individual Practices in Civil Cases, it is hereby ordered that the parties shall submit their Joint Pretrial Report and any other required materials by April 4, 2014. Counsel for all parties are instructed to appear for a scheduling conference on April 10, 2014, at 2:00 PM, in Courtroom 906 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. The parties must participate in at least one hour of good-faith settlement discussions prior to the conference.

SO ORDERED.

Dated: March ___ 18___, 2014
        New York, New York

_____
ALISON J. NATHAN
United States District Judge

61